## LOUISVILLE & NASHVILLE RAILROAD COMPANY *v.* UNITED STATES.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF TENNESSEE.

No. 673.  Argued March 1, 1915.—Decided June 1, 1915.

The general rule is that the Appellate Court will not interfere with the
decision of the Chancellor refusing an interlocutory injunction unless
abuse of discretion clearly appears; where, however, the order sought
to be enjoined operates to reduce revenue the Chancellor's discretion
should be influenced by the fact that the decree, though interlocu-
tory, may be the equivalent of a final decree.

The fact that irreparable injury might result from orders of the Inter-
state Commerce Commission, unless interlocutory injunctions might
be granted restraining their enforcement, undoubtedly influenced
Congress to enact the provision in the Act of October 22, 1913, for
a direct appeal to this court from an order granting or denying, after
notice and hearing, an interlocutory injunction.

Where appellants are able to concede that there was evidence which,
although conflicting, tended to support the findings of the Commis-
sion, the practice of omitting the testimony and simply insisting in
this court that the findings are insufficient to support the orders is
commendable, not only as a saving of expense of printing the record
but also of eliminating such testimony, as is necessarily immaterial
in an appellate court which cannot reverse findings if supported by
any substantial evidence, even though the evidence be conflicting.

The new Equity Rules (75, 76, 77) call for a winnowing out of the use-

less; the presentation of only relevant evidence and exhibits; the elimination of reduplications of oral and written evidence and condensation into narrative form of what is material to the issue before the court.

Where an existing freight rate is attacked, the burden is on complainant to show that it is unreasonable in fact; this rule especially applies when the rate has been in force for a long period, during which the traffic has greatly increased in volume.

Market price of property and work is affected by so many and varying factors that it is impossible to lay down fixed rules for ascertaining actual value; a common measure, however, is by comparison with amounts charged for the same article by different persons. This applies to some extent to freight charges by carriers.

Mere distance is not necessarily a determining factor in fixing freight rates; competition by water and rail and in the markets largely enter into such determination.

While mere comparison of rates does not necessarily tend to establish reasonableness of either, the finding of one of many rates to be higher than all the others may give rise to the presumption that the single rate is high; and if some of the lower rates had been prescribed by the Interstate Commerce Commission, there is a *prima facie* standard for testing the reasonableness of the rate under investigation.

The Interstate Commerce Commission having in this case, after consideration of much and varied evidence as to the rates charged on coal to Nashville, fixed the amount of the rate in light of the findings made on such testimony, and as the rate fixed is not claimed to be confiscatory, this court holds that the findings support the order fixing the rate.

An order in this case requiring a carrier to extend to connecting carriers, as to competitive business, the same switching facilities that it extends to some of the other connecting carriers, in regard to the same class of business, is not violative of the due process provision of the Fifth Amendment, nor does it violate the provision in § 15 of the Commerce Act that a carrier shall not be required to give the use of its tracks or terminals to another carrier engaged in like business. *Pennsylvania* v. *United States*, 236 U. S. 351.

216 Fed. Rep. 672, affirmed.

THE facts, which involve the validity of orders of the Interstate Commerce Commission establishing rates on coal and also requiring the carrier to furnish certain switching facilities to connecting carriers, are stated in the opinion.

*Mr. William A. Colston,* with whom *Mr. Henry L. Stone, Mr. Claude Waller, Mr. John B. Keeble* and *Mr. Wm. A. Northcutt* were on the brief, for appellants:

If the facts found do not as a matter of law support the orders made, or if the Commission was without jurisdiction to make the orders, or if the orders result in taking appellants' property without due process of law, the interlocutory injunction should have been granted.

The facts found with respect to the coal rates do not, as a matter of law, support the order fixing rates.

The Commission was without jurisdiction to make the order fixing rates.

The enforcement of the Commission's order fixing rates takes appellants' property without due process of law.

The facts found by the Commission do not, as a matter of law, support the order as to switching practices.

The Commission was without jurisdiction to make the order as to switching practices.

The enforcement of the order as to switching practices takes appellants' property without due process of law.

The appellants have made out their case for a temporary injunction.

In support of these contentions, see *Buffalo Gas Co.* v. *Buffalo,* 156 Fed. Rep. 370; *Chicago Live Stock Ex.* v. *C. G. W. Ry.,* 10 I. C. C. 428; *Cotting* v. *Kansas City Stockyards,* 183 U. S. 79; *E. T., V. & G. Ry.* v. *Int. Com. Comm.,* 181 U. S. 1; *Fla. East Coast Ry.* v. *United States,* 234 U. S. 167; *Grand Trunk Ry.* v. *Michigan R. R. Comm.,* 231 U. S. 472; *Int. Com. Comm.* v. *Ala. Mid. Ry.,* 168 U. S. 144; *Int. Com. Comm.* v. *C., B. & Q. Ry.,* 168 U. S. 320; *Int. Com. Comm.* v. *C. G. W. Ry.,* 209 U. S. 108, 119; *Int. Com. Comm.* v. *Clyde S. S. Co.,* 181 U. S. 29; *Int. Com. Comm.* v. *C., R. I. & P. R. R.,* 218 U. S. 88, 101; *Int. Com. Comm.* v. *Ill. Cent. R. R.,* 215 U. S. 452; *Int. Com. Comm.* v. *Diffenbaugh,* 222 U. S. 42; *Int. Com. Comm.* v. *Louis. & Nash. R. R.,* 227 U. S. 88, 90–92; *Int. Com. Comm.* v.

*Louis. & Nash. R. R.,* 190 U. S. 273; *Int. Com. Comm.* v. *Louis. & Nash. R. R.,* 73 Fed. Rep. 409; *Int. Com. Comm.* v. *Nor. Pac. Ry.,* 216 U. S. 538; *Int. Com. Comm.* v. *Stickney,* 215 U. S. 98; *Intermountain Rate Cases,* 234 U. S. 476; *Indianapolis Gas Co.* v. *Indianapolis,* 82 Fed. Rep. 245; *K. & I. Bridge* v. *Louis. & Nash. R. R.,* 37 Fed. Rep. 567; *L. R. & M. Ry.* v. *St. L., I. M. & S. Ry.,* 41 Fed. Rep. 559; *S. C.,* 59 Fed. Rep. 400; *Louis. & Nash. R. R.* v. *Siler,* 186 Fed. Rep. 176; *Louis. & Nash. R. R.* v. *Stockyards Co.,* 212 U. S. 139; *Louis. & Nash. R. R.* v. *Behlmer,* 175 U. S. 648; *Memphis Freight Bureau* v. *Louis. & Nash. R. R.,* 26 I. C. C. 402; *Merchants' Ass'n of Baltimore* v. *Penna. R. R.,* 23 I. C. C. 474; *Morris Iron Co.* v. *Balt. & Oh. R. R.,* 26 I. C. C. 240; *New Memphis Gas Co.* v. *Memphis,* 72 Fed. Rep. 952; *Pac. Tel. Co.* v. *Los Angeles,* 192 Fed. Rep. 1009; *Philadelphia Co.* v. *Stimson,* 223 U. S. 605; *Raymond* v. *Chicago Un. Tract. Co.,* 207 U. S. 20; *Reagan* v. *Farmers L. & T. Co.,* 154 U. S. 362; *Slider* v. *Southern Ry.,* 24 I. C. C. 312, 313; *Southern Ry.* v. *St. Louis Hay Co.,* 214 U. S. 297; *Spring Valley Water Co.* v. *San Francisco,* 165 Fed. Rep. 667; *Tap Line Cases,* 234 U. S. 1; *Tex. & Pac. Ry.* v. *Int. Com. Comm.,* 162 U. S. 197; *United States* v. *La. & Pac. Ry.,* 234 U. S. 1; *United States* v. *St. Louis Terminal Assn.,* 224 U. S. 383; *Waverly Oil Works* v. *Penna. R. R.,* 28 I. C. C. 621; Burke's Works (11) Boston ed., 1869; 22 Cyc. 751, 755, 782, 783, 822; High on Injunctions, § 13, pp. 19, 20; 1 History of English Law, p. XXVII; 2 Wigmore on Evidence, § 1353, p. 1666.

The ultimate findings of fact or conclusions of the Interstate Commerce Commission as to reasonableness or discrimination are subject to judicial review.

It was not necessary nor even desirable upon the motion for an interlocutory injunction to bring up the voluminous record before the Interstate Commerce Commission.

The facts found with respect to the rate order do not, as a matter of law, support the order fixing rates, and the Commission was without jurisdiction to make that order.

The facts found with respect to the order as to switching practices do not, as a matter of law, support that order, and the Commission was without jurisdiction to make the order as to switching practices.

Extracts from the debates on the Hepburn Bill show that Congress has not changed the rule as to review of the Commission's finding of fact by the judicial power of the Government, and that the conclusions of the Interstate Commerce Commission are subject to judicial review.

Extracts from the debates on the Hepburn Bill show that the amendment of § 1 of the Act to Regulate Commerce, defining the term "transportation" was intended to prevent unjust discrimination which necessarily arises from the ownership and control of facilities of transportation by shippers and receivers of freight.

In support of these contentions, see cases *supra* and *Bowling Green* v. *Louis. & Nash. R. R.,* 24 I. C. C. 228; *C., M. & St. P. Ry.* v. *Minnesota,* 134 U. S. 456; *Nashville* v. *Louis. & Nash. R. R.,* 33 I. C. C. 76; *Cohens* v. *Virginia,* 6 Wheat. 399; *Ex parte Young,* 209 U. S. 123; *Florida East Coast Ry.* v. *United States,* 234 U. S. 167; *Florida Shippers* v. *Atl. Coast Line,* 14 I. C. C. 476; *S. C.,* 17 I. C. C. 552; *S. C.,* 22 I. C. C. 11; *Int. Com. Comm.* v. *Union Pacific R. R.,* 222 U. S. 541; *In re Financial Relations &c. of Carriers,* 33 I. C. C. 168; *Lebanon Commercial Club* v. *Louis. & Nash. R. R. Co.,* 28 I. C. C. 301; *Mt. Pleasant Fertilizer Co.* v. *Louis. & Nash. R. R.,* No. 6186, before I. C. C., Unreported No. A-748; *Pennsylvania Co.* v. *United States,* 236 U. S. 351; *Slider* v. *Southern Ry. Co.,* 24 I. C. C. 312, 313; *United States* v. *Louis. & Nash. R. R.,*

235 U. S. 314; *United States* v. *Louis. & Nash. R. R.*, 236 U. S. 318.

*Mr. Solicitor General Davis* for the United States:

The granting or refusing of an interlocutory injunction is a matter in the sound discretion of the court, and is not to be reviewed unless this discretion has been abused. No such abuse here appears. *Buffington* v. *Harvey,* 95 U. S. 99, 100; *Thompson* v. *Nelson,* 71 Fed. Rep. 339; *Vogel* v. *Warsing,* 146 Fed. Rep. 949; *American Grain Separator Co.* v. *Twin City Separator Co.,* 202 Fed. Rep. 202; *Samson Cordage Works* v. *Puritan Cordage Mills,* 211 Fed. Rep. 603.

The order of the Commission declaring the coal rate unreasonable involves a question of fact, and is neither without substantial evidence to support it, nor contrary to the indisputable character of the evidence.

The reasonableness of a rate is a question of fact, and the finding of the Commission thereon is conclusive unless it be without substantial evidence to support it or contrary to the indisputable character of the evidence. *Ill. Cent. R. R.* v. *Int. Com. Comm.,* 206 U. S. 441, 455; *Int. Com. Comm.* v. *Chicago & Alton R. R.,* 215 U. S. 479; *Int. Com. Comm.* v. *Ill. Cent. R. R.,* 215 U. S. 452; *Int. Com. Comm.* v. *C., R. I. & P. Ry.,* 218 U. S. 88, 110; *Int. Com. Comm.* v. *Del., Lack. & West. R. R.,* 220 U. S. 235; *Int. Com. Comm.* v. *Louis. & Nash. R. R.,* 227 U. S. 88; *Los Angeles Switching Case,* 234 U. S. 294; *United States* v. *Louis. & Nash. R. R.,* 235 U. S. 314.

The order of the Commission as to discriminatory switching practices likewise involves a question of fact, as to which the finding of the Commission is neither without substantial evidence to support it nor contrary to the indisputable character of the evidence. Nor does it violate any constitutional or statutory right of appellants.

Undue discrimination is a question of fact within the peculiar province of the Commission. *Int. Com. Comm. v. Alabama Midland Ry.*, 168 U. S. 144, 170; *Penna. R. R. v. International Coal Co.*, 230 U. S. 184, 196; *Mitchell Coal Co. v. Penna. R. R.*, 230 U. S. 247; *United States v. Louis. & Nash. R. R.*, 235 U. S. 314.

*Penna. Co. v. United States*, 236 U. S. 351, as to switching practices, is decisive of this case.

*Mr. Charles W. Needham*, with whom *Mr. Joseph W. Folk* was on the brief, for Interstate Commerce Commission:

All the matters in controversy were cognizable by the Commission.

There was substantial evidence before the Commission to support the orders in question.

The evidence was sufficient as to reasonableness of rates involved. The orders were based upon probative evidence and were not arbitrary.

On the facts of record before it the Commission was empowered to require appellants to cease and desist from their unjust discrimination with respect to switching practices at Nashville.

The order with respect to switching practices does not deprive appellants of their property without due compensation, in violation of the Fifth Amendment to the Constitution of the United States.

There was no error in the refusal of the District Court to grant appellants' motion for an interlocutory injunction.

In support of these contentions, see *Armour Packing Co. v. United States*, 209 U. S. 56; *Atchison, T. & S. F. Ry. v. United States*, 232 U. S. 199; *Balt. & Ohio R. R. v. Pitcairn Coal Co.*, 215 U. S. 481; *Beebe v. Guinault*, 29 La. Ann. 795; *Bonand v. Denesi*, 42 Georgia, 639; *Castoriano v. Dupe*, 145 N. Y. 250: *Chicago, M. & St. P. Ry. v. Iowa*,

233 U. S. 334; *Newton* v. *Levis*, 79 Fed. Rep. 715; *Colonial City Trackage Co.* v. *Kingston City R. R.*, 153 N. Y. 540; *Grand Trunk Ry.* v. *Michigan Railway Commission*, 231 U. S. 457; *Higginson* v. *C., B. & Q. Ry.*, 102 Fed. Rep. 197; *Houston & Texas Ry.* v. *United States*, 234 U. S. 342; *Ill. Cent. Ry.* v. *Int. Com. Comm.*, 206 U. S. 441; *Int. Com. Comm.* v. *Alabama Midland Ry.*, 168 U. S. 144; *Int. Com. Comm.* v. *Baltimore & Ohio R. R.*, 225 U. S. 306; *Int. Com. Comm.* v. *C., R. I. & P. Ry.*, 218 U. S. 88; *Int. Com. Comm.* v. *D., L. & W. Ry.*, 220 U. S. 235; *Int. Com. Comm.* v. *Ill. Cent. R. R.*, 215 U. S. 452; *Int. Com. Comm.* v. *Louis. & Nash. R. R.*, 227 U. S. 88; *Int. Com. Comm.* v. *Nor. Pac. Ry.*, 216 U. S. 538; *Int. Com. Comm.* v. *Un. Pac. R. R.*, 222 U. S. 541; *Jones* v. *Thatcher*, 48 Georgia, 83; *Kelley* v. *Boettscher*, 89 Fed. Rep. 125; *Kerr* v. *New Orleans*, 126 Fed. Rep. 920; *Lighterage Cases*, 225 U. S. 306; *Louis. & Nash. R. R.* v. *Finn* [Jan., 1915]; *MacLaury* v. *Hart*, 121 N. Y. 636; *McHenry* v. *Jewett*, 90 N. Y. 58; *Memphis Freight Bureau* v. *Louis. & Nash. R. R.*, 26 I. C. C. 402; *Baltimore Merchants Assn.* v. *Penna. R. R.*, 23 I. C. C. 474; *Minnesota Rate Cases*, 230 U. S. 352; *Mo. Pac. Ry.* v. *Larabee Mills*, 211 U. S. 612; *N. Y., New Haven & H. R. R.* v. *Int. Com. Comm.*, 200 U. S. 361; *Procter & Gamble* v. *United States*, 225 U. S. 282; *Rock Island Ry.* v. *Rio Grande R. R.*, 143 U. S. 590; *Schneider* v. *Rochester*, 155 N. Y. 619; *Southern Pac. Co.* v. *Earl*, 82 Fed. Rep. 690; *So. Pac. Co.* v. *Int. Com. Comm.*, 219 U. S. 433; *Strasser* v. *Moonelis*, 108 N. Y. 611; *Tex. & Pac. Ry.* v. *Abilene Cotton Co.*, 204 U. S. 426; *Un. Pac. Ry.* v. *Chi. &c. Ry.*, 163 U. S. 563; *United States* v. *Louis. & Nash. R. R.*, 235 U. S. 314; *Wisconsin &c. R. R.* v. *Jacobson*, 179 U. S. 287; *Workingmen's Council* v. *United States*, 57 Fed. Rep. 85; *Young* v. *R. K. G. L. Co.*, 129 N. Y. 57.

*Mr. A. G. Ewing, Jr.*, with whom *Mr. T. J. McMorrough* was on the brief, for the city of Nashville.

MR. JUSTICE LAMAR delivered the opinion of the court.

The Traffic Bureau of Nashville instituted proceedings before the Commerce Commission against the Louisville & Nashville, Nashville, Chattanooga & St. Louis, Tennessee Central, Illinois Central R. R. Companies, and the Nashville Terminal Company, seeking (1) a reduction of the $1 rate on coal and (2) to require a discontinuance of what was alleged to be a discriminatory switching practice in the yard at Nashville. After an elaborate hearing, in which volumes of testimony were taken, the Commission found that the $1 coal rate was unreasonable, and established an 80 cent rate. It also passed an order requiring the Railroad Companies to discontinue the discrimination in furnishing switching facilities. Thereupon the two Railroad Companies, first named, appellants herein, filed a bill in the District Court for the Middle District of Tennessee against the United States, the Commerce Commission and others attacking the validity of these two orders. The application for a temporary injunction having been denied the case was appealed to this court.

1. On the argument here the Appellants insisted that under the decisions in *Florida East Coast Ry.* v. *United States*, 234 U. S. 167; *Int. Com. Comm.* v. *Un. Pac. R. R.*, 222 U. S. 541; *Int. Com. Comm.* v. *Louis. & Nash. R. R.*, 227 U. S. 88, this court will determine whether the facts found do, as a matter of law, support the order of the Commission. The Government, on the other hand, contended that the case should be disposed of in conformity with the principle that an Appellate Court will not interfere with the decision of a Chancellor, refusing to grant an interlocutory injunction, unless it clearly appears that there has been an abuse of discretion. There can, of course, be no doubt that such is the general rule. But where the order of the Commission operates to reduce revenue it is manifest that the Chancellor's discretion should be influenced by the

fact that, though the application is for an interlocutory injunction, the decision thereon may, in many respects, be the equivalent of a final decree. On such a hearing the court should, therefore, consider that fact with all others, and grant the injunction, grant it on terms, or refuse it as the equity of the case may warrant.

It was no doubt because of the limited time in which orders of the Commission would be operative and that there might be cases in which irreparable injury would result if an interlocutory injunction was not granted, that Congress, by the Act of October 22, 1913 (38 Stat. 220) provided that *"an appeal may be taken direct to the Supreme Court of the United States from the order granting or denying, after notice and hearing, an interlocutory injunction.   .   .   ."* This clause and the reasons above mentioned were evidently taken into consideration by the three judges who heard this case. For, in passing upon the application, the court made a full statement of the facts, delivered a carefully prepared opinion discussing the various contentions of the complainants and then made a decision on the merits of the case as submitted.

2. The facts involved have been so fully stated by the Commission (28 I. C. C. 533) and by the court below (216 Fed. Rep. 672) that it is unnecessary here to repeat them. The Railroad Companies did not offer all of the evidence which was considered by the Commission; and on this appeal they do not include in the record all of the hundreds of pages of testimony which had been submitted to the Commission, but—conceding that the evidence was conflicting and tended to support the findings of the Commission—they insist that the facts found were insufficient in law to sustain the orders which were made. This most commendable practice not only saved the expense of printing many volumes of testimony, but saved the substantial points in the case from being submerged in a flood

of testimony—much of which was explanatory before the Commission and most of which was wholly immaterial in an Appellate Court which cannot reverse findings when supported by substantial—though conflicting—evidence. The practice is also in compliance with the spirit of the new Equity Rules (75, 76, 77) which call for just such a winnowing out of the useless; the presentation of only the relevant parts of exhibits, documents, tables, and reports; the elimination of all reduplications in written and oral testimony and a condensation into narrative form of what is material to the then issue before the court.

3. By virtue of this conformity to the rules, we are in a position to consider the sharp-cut issue as to whether, as matter of law, the Commission's findings of fact sustain its order, and shall discuss first the rate on coal which, being treated as typical, was principally argued by counsel.

Where an existing freight rate is attacked, the burden is on the complainant to establish that it is unreasonable in fact. This is especially so where, as here, the rate has been in force for a long period during which time the traffic greatly increased in volume. In order to carry this burden in the present case, the Traffic Bureau, while alleging that the rate was unreasonable in itself and by comparison with other like rates, does not seem to have attempted to prove the cost, or value of the carrier's service, but apparently relied largely on proof showing that the Nashville rate was higher than that charged for a similar haul to other points.

While some elements of value are fixed, the market price of property and work is affected by so many and such varying factors as to make it impossible to lay down a rule by which to determine what any article or service is worth. But one of the most common measures by which to value the property or service of A is to compare it with the amount charged for the same thing by B, C and D. But

this method, if made the sole basis for ascertaining values, may often lead to improper results. For B, C and D may charge too much, or they may have been forced to charge too little. The same is true of determining, by comparison, the reasonableness of freight charges. Until some standard is adopted they may prove nothing—even where the two hauls are over the same mileage. For the rate attacked may tend to show that the others are too low—while they in turn might be relied on to prove that the first is too high. Both may be unreasonably high, or too low because compelled by conditions over which the carrier had no control. Water competition, rail competition, and competition of markets, enter so largely into the establishment of rates that mere distance is not necessarily a determining factor—indeed the statute itself recognizes that there may be circumstances under which it is lawful to charge less for a long haul than for a short haul over the same road. But while all this be true it is, nevertheless, a fact that a comparison of rates between two points on the same road, or with the charges on other roads, may furnish evidence of probative value.

In the present case the Commission pointed out that many facts had to be considered in applying the evidence offered for the purpose of showing that the $1 rate to Nashville was high by comparison with the charge made to other points. It found that coal was shipped over the Louisville & Nashville R. R. from Kentucky mines to Nashville, Memphis and Louisville. It also found that there was no substantial dissimilarity in the conditions at those three points and instituted a special comparison between the rates to those three cities. The result may be indicated by the following tabulation:

From Mines—

To Nash., via L. & N., 109 m., $1 p. ton, or 9.2 mills p. m.
  Memphis, " " " " 276 " 1.10 "        4.    " " "
  Louisville, " " " " 142 " .65 "        4.5 " " "

The defendants insisted that its $1.10 rate to Memphis did not furnish a fair criterion because it had been made low and reduced in order to meet competition.     The commission, however, found that the *river rate* to Memphis was $1.40 per ton so that the Appellant's "not unreasonable" (26 I. C. C. 402) rate of $1.10 was not compelled by water competition.     It further found that the rail competition at Memphis was not compelling.     On these facts, and after giving a history of the increase and decrease in that rate (26 I. C. C. 402), the Commission seems to have treated the $1.10 rate, for 276 miles to Memphis, as in the nature of a voluntary charge which would tend to indicate that the $1 rate for 109 miles to Nashville was too high. A similar view was taken of the situation at Louisville, where water competition existed and where the 60-cent rate from the mine to Louisville, 142 miles, was practically the same as that of the Illinois Central which charged the same rate for a haul of 125 miles to Louisville.

Of course, competition by rail as well as by water may compel such a reduction in rates as altogether to destroy their value for purposes of comparison.     But, as we understand, the Commission held that while there should be no parity between these cities, the rate of .60 charged by the Illinois Central for a haul of 125 miles to Louisville was, in view of all the facts, some indication of what a road like the Louisville & Nashville should charge on a haul of 109 miles to Nashville.

Among many other details briefly discussed in the report, the Commission dealt with the question of the earnings on the coal business to Nashville.     It found that the Louisville & Nashville's coal cars had an average capacity of 41 tons, so that on shipments from the mines to Nashville there was a car revenue of $41, or a per-car-mile earning of 37.78 cents.     If the car was returned empty, there would be a per-car-mile earning

of 18.87 cents. With this as a basis there was a comparison of the Nashville coal earnings with those on all traffic over the other roads entering that city. It showed:

|  | cents |
|---|---|
| L. & N. $1 rate on *coal* to N'ville, per car-mile earnings | 37.78 |
| N., C. & St. L., " " " " | 24.64 |
| Illinois Central " " " " | 24.00 |

Average of *all traffic,* loaded and unloaded:

|  | cents |
|---|---|
| L. & N., per car-mile earnings | 10.54 |
| N., C. & St. L., " " | 10.08 |
| Illinois Central " " | 7.78 |
| Tennessee Central " " | 16.43 |

In addition to these comparisons of coal rates and average earnings on all traffic, loaded and empty, the Commission found that while the $1 rate to Nashville had been in force many years, the carrying capacity of the cars had increased from 16 to 41 tons and the tractive power of engines from 660 to 1,165 tons. This practically doubled the earning capacity of fully loaded trains; and if, as argued, there has been a much larger increase in cost of labor, material, taxes and operating expenses no proof of that fact was made tȯ the commission, for it found that "there was little more than a suggestion in the record as to the increased cost of labor and material and no attempt . . . to show operating cost." At the hearing of the application for a Temporary Injunction an affidavit was offered to show that the increase in cost of operation had largely exceeded the increase in earning capacity. But such evidence, important in itself and on the issue of reasonableness, cannot be considered here for the reason that it shifts the issue, for the case was submitted to the District Court not to pass on the facts but on the theory

that though the conflicting evidence might sustain the finding, · the *facts found* did not as matter of law sustain the order.

It further appeared in the Report and Finding of the Commission that the Nashville Bureau [1] had offered innumerable exhibits comparing on ton and car-mile bases the Nashville rate with that to points in the southeast and on the Ohio and Mississippi Rivers. *Among these were certain rates which the Commission had prescribed.* · There was also a general comparison on the Nashville rate with the charge for coal and other commodities to Nashville and other destinations. This evidence showed that *"in all these instances the Nashville rate yields the greatest earnings."*

Giving the widest possible effect to the fact that mere comparison between rates does not necessarily tend to establish the reasonableness of either, it is still true that, when one of many rates is found to be higher than all others, there may arise a presumption that the single rate is high. And when to that is added the fact that some of the comparative and lower rates had been prescribed by the Commission, there was at least a *prima facie* standard

---

[1] "In support of these contentions complainants offered innumerable exhibits comparing on ton, car, and train mile bases the Nashville rate with the rates on coal obtaining north of the Ohio River; with rates to St. Louis, East St. Louis, Louisville, Cincinnati, Memphis, and other points on the Ohio and Mississippi rivers from mines in Kentucky, Tennessee, and Virginia; with rates on coal prescribed by this Commission in a number of cases; with rates on coal to Chattanooga and to certain destinations in the southeast; with rates on coal from other mines to Nashville; with rates on other commodities to Nashville and to other destinations; with the average per-ton and per-car-mile rate received by defendants and other carriers on all traffic. In all of these instances the Nashville rate yields the greatest earnings. In elaborate detail defendants sought to analyze and rebut these comparisons in an endeavor to show that none was of any value in determining the reasonableness of the rate in issue."

which, after allowing for dissimilarity in conditions, might be used along with all the other evidence in order to test the reasonableness of the Nashville rate. No one of those facts was conclusive, for the character of the country through which the two roads had been built might differ. One might run through a level, thickly populated territory,—the other might have steep grades, long tunnels and a roadway expensive to maintain. The capital invested, the traffic hauled, the cost of operation and the earnings might differ, but nevertheless what was shown to be a reasonable rate on one, might, after allowing for the dissimilarity in conditions, earnings and cost, be a factor in determining the reasonableness of the rate on the other. The report in this case shows that the rate-making body had before it much and varied evidence of this character. After considering it as a whole, the Commission found that the $1-rate on coal shipped from the Kentucky mines to Nashville was unreasonable. In the light of these findings we cannot say that the facts set out in the Report, do not support the order. And since there is no contention, at this time, that the reduced rate is confiscatory, we can but repeat what was said in *Int. Com. Comm. v. Louis. & Nash. R. R.,* 227 U. S. 88:

"The pleadings charged that the new rates were unjust in themselves and by comparison with others. This was denied by the carrier. The Commission considered evidence and made findings relating to rates which the carrier insists had been compelled by competition, and were not a proper standard by which to measure those here involved. The value of such evidence necessarily varies according to the circumstances, but the weight to be given it is peculiarly for the body experienced in such matters and familiar with the complexities, intricacies and history of rate-making in each section of the country."

5. In its complaint before the Commission the Traffic

Bureau also attacked the practice of the Appellants by which, under filed tariffs, each made a charge of $3 per car for switching *non-competitive business* between industries within the terminal limits and in conjunction with the Tennessee Central.

The Bureau insisted that this practice was discriminatory and designed to prevent the switching of coal between the Tennessee Central and private industries, located on sidings and reached through the Terminals. The defendants admitted the practice and the intention, but insisted that the Yards had never been thrown open to such business. They claimed that they had the right to the exclusive use of their own terminals and could not be required to switch cars loaded with "coal or competitive freight" to and from the Tennessee Central.

In considering this branch of the case the Commission found that the Louisville & Nashville and the Nashville, Chattanooga & St. Louis, by reason of endorsements on bonds, and by an agreement to pay 4 per cent. on the capital stock of the Nashville Terminal Company, had leased the Yards for 999 years,—the rental being paid by the two lessees in proportion to the business done by each; That while the Louisville & Nashville owned 70 per cent. of the stock of the Nashville, Chattanooga & St. Louis, the two roads were not only separate corporate entities but were competitors at Nashville—particularly in the transportation of coal. It found that each switched for the other and both switched for the Tennessee Central, except as to "coal and competitive business." It found that such a switching practice was unreasonable and unjustly discriminatory, and that a 'reasonable practice would permit the switching of coal from the interchange of each carrier to industries on the rails of each other.' It thereupon issued an order requiring Appellants to cease the discrimination found to exist and to maintain "a practice which will permit the interswitching of such

shipments from and to the lines of each and every defendant" [including Tennessee Central].

The Appellants attack this order as being void because (1) it compels them to admit the Tennessee Central into an arrangement. for operating joint terminals at Nashville under a contract guaranteeing interest on bonds and pro-rating operating expenses; (2) takes their property in the Yards without due process of law; (3) violates § 15 of the Commerce Act (34 Stat. 589) in compelling them, in effect, to make through routes and joint rates with the Tennessee Central when the appellants themselves have already established "a reasonable and satisfactory through route;" and (4) violates § 3 of the same Act which, after requiring carriers to afford equal facilities for the interchange of traffic, declares that the section "shall not be construed as requiring any such carrier to give the use of its tracks or terminal facilities to another carrier engaged in like business."

These objections treat the order as being broader than its terms. The Commission did not, as in *Waverly Oil Works Co.* v. *Penna. R. R.*, 28 I. C. C. 626, 627, pass upon the question as to what was a proper switching charge as affected by the rental of the yard and the cost of operation. Neither did it direct the Appellants to establish a joint rate and a through route with the Tennessee Central. Neither did it order the Appellants to give the use of their terminals to the Tennessee Central, but, only required them to render to the latter the same service that each of the Appellants furnishes the other in switching cars to industries located in and near the Yard.

Disregarding the complication arising out of joint ownership and the fact that each of the Appellants switches for the other, it will be seen that the Commission is not dealing with an original proposition, but with a condition brought about by the Appellants themselves.

Under the provisions of the Commerce Act (24 Stat. 380)
the reciprocal arrangement between the two Appellants
would not give them a right to discriminate against any
person or "particular description of traffic." For, § 3
requires Railroad Companies to furnish equal facilities
for the interchange of traffic between their respective
lines . . . "provided that this should not be con-
strued as requiring any such common carrier to give the
use of its tracks or terminal facilities to another carrier
engaged in like business." If the carrier, however, does
not rest behind that statutory shield but chooses volun-
tarily to throw the Terminals open to many branches of
traffic, it to that extent makes the Yard public. Having
made the Yard a facility for many purposes and to many
patrons, such railroad facility is within the provisions of
§ 3 of the statute which prohibits the facility from being
used in such manner as to discriminate against patrons
and commodities. The carriers cannot say that the Yard
is a facility open for the switching of cotton and wheat and
lumber but cannot be used as a facility for the switching
of coal. Whatever may have been the rights of the car-
riers in the first instance; whatever may be the case if the
Yard was put back under the protection of the proviso to
§ 3, the Appellants cannot open the Yard for most switch-
ing purposes and then debar a particular shipper from a
privilege granted the great mass of the public. In sub-
stance that would be to discriminate not only against the
tendering railroad, but also against the commodity which
is excluded from a service performed for others. This
feature of the case was thus dealt with by the District
Court:

"We think it clear that this order does not require the
petitioners to give the use of their tracks and terminal
facilities to the Tennessee Central Railroad, within the
meaning of the proviso contained in Section 3 of the Act
to Regulate Commerce, or constitute an appropriation of

such tracks and terminals for the use of the Tennessee Central Railroad.

\*      \*      \*      \*      \*      \*      \*      \*

"There is furthermore no evidence that the switching practices prescribed will violate the constitutional provision against taking property without due process of law. See *Grand Trunk Ry.* v. *Michigan Commission*, 231 U. S. 468. And it may well be assumed that the petitioners will not themselves establish a switching charge so low as to be confiscatory."

The question, as to power of the Commission to make this part of the order, is settled by the decision in *Pennsylvania Company* v. *United States*, 236 U. S. 318, recently decided. The appellants, however, insist that that case did not involve *switching* but *transportation;* and further they claim that the Pennsylvania road was there ordered to *discontinue* discrimination—while here the appellants are required by an affirmative order to *devote* their property to the use of a parallel and competing carrier. But the alleged differences do not serve to take the present case out of the principle announced in that just cited. For in this order the prohibition against the existing practice and the requirement to furnish equal facilities come to the same thing.

In this case the controlling feature of the Commission's order is the prohibition against discrimination. It was based upon the fact that the appellants were at the present time furnishing switching service to each other on *all* business, and to the Tennessee Central on all except coal and competitive business. As long as the Yard remained open and was used as a facility for switching purposes the Commission had the power to pass an order—not only prohibiting discrimination—but requiring the appellants to furnish equal facilities "to all persons and corporations without undue preference to any particular class of persons." The question as to what is a proper practice, the

amount of charge therefor and the length of time such switching ervice is to continue are matters not presented for decision on this record. The judgment of the District Court is

*Affirmed.*

MR. JUSTICE PITNEY concurs in the result.

MR. JUSTICE MCREYNOLDS took no part in the consideration and decision of this case.