**STATE CORPORATION COMMISSION OF The State of KANSAS, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. T-1869.

United States District Court
D. Kansas.
May 11, 1959.

693

James E. Gillen, Chicago, Ill., M. E. Clinton, Dallas, Tex., Toll R. Ware, E. D. Grinnell, Jr., St. Louis, Mo., Edwin N. Bell, Houston, Tex., William R. McDowell, Dallas, Tex., William P. Higgins, Wichita, Kan., C. J. Putt, Edwin M. Wheeler, Topeka, Kan., Martin L. Cassell, James M. Souby, Jr., Chicago, Ill., Clayton Davis, Mark Bennett, Topeka, Kan., of counsel, for intervening Railroads.

Clarence Raymond, Louisville, Ky., James L. Tapley, Washington, D. C., Ralph W. Oman, Topeka, Kan., of counsel, for Intervening Southern Railroads.

Before BRATTON, Chief Circuit Judge, HUXMAN, Circuit Judge, and HILL, Chief District Judge.

HILL, District Judge.

This action is brought by the State Corporation Commission of the State of Kansas against the United States under the provisions of 28 U.S.C. §§ 1336, 1337, 1398 and 2321 to 2325, inclusive, to enjoin, annul and set aside an order of the Interstate Commerce Commission. The Interstate Commerce Commission and certain Western railroads were permitted to intervene as party defendants and forty-two Southern railroads have been allowed to intervene as party plaintiffs. Pursuant to 28 U.S.C. § 2284, a three-judge court was constituted and convened.

Jay Kyle, Gen. Counsel, Topeka, Kan., Byron M. Gray, Special Counsel, Topeka, Kan., for plaintiff, State Corp. Commission, of Kansas.

Victor R. Hansen, Asst. Atty. Gen., William C. Farmer, U. S. Dist. Atty., Topeka, Kan., James E. Kilday, Willard R. Memler, Attys., Dept. of Justice, Washington, D. C., for the United States.

Robert W. Ginnane, Gen. Counsel, I. K. Hay, Assoc. Gen. Counsel, Interstate Commerce Commission, Washington, D. C., for Interstate Commerce Commission.

This is a rate relationship case involving Section 3(1) of the Interstate Commerce Act, 24 Stat. 380, as amended, 54 Stat. 902 (1940) 49 U.S.C.A. § 3(1).[1] The genesis of this controversy begins with the Hoch-Smith Resolution passed by Congress in 1925 requiring an investigation of the grain rate structure. 43 Stat. 801, 49 U.S.C.A. § 55. In its investigation of the national grain structure, the Commission divided the country into five major rate territories, including

1. The relevant portion of this Section is as follows: "It shall be unlawful for any common carrier * * * to make, give, or cause any undue or unreasonable preference or advantage to any particular * * * region, district, (or) territory * * * or to subject any particular * * * region, district, (or) territory * * * to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

the Official, Southern, Western Trunk Line, Southwestern and Mountain Pacific territories.[2] This mandate precipitated two grain rate cases which are the predecessors of the instant action, commonly referred to as the Grain and Southern cases.[3] The latter case was a continuation of the Grain case.

Pursuant to the Hoch-Smith resolution, the Commission held extensive hearings relative to the grain rate structure. In 1935, the Commission filed its report, which included the grain rates for the Oklahoma and Kansas area via the Memphis gateway.[4] In the preparation of the report, it considered the Enid and Wichita groups as representative areas of the two states, and correlated the rates of the other groups in each state to the rate established for the representative group in that state.[5] For many years prior to the effective date of the order of the Commission in the Grain case, the rates to Memphis were, from Enid 31.5 cents, from Wichita, the southern Kansas area, 36 cents, and from Beloit, the northern section of the Wichita group, 39.5 cents.[6] On August 1, 1936, a supplemental report in the Grain case was made.[7] In 1946, the Commission issued its order on rates to, from, and within the South.[8] The

rates, as prescribed in the Southern case, became effective May 16, 1946.

As a result of subsequent general increases, the rates to Memphis prior to the order of the Commission presently under attack on shipments destined to the South, were 45 cents from Enid, 49 cents from Wichita, and 55.5 cents from Beloit. On shipments to Memphis proper, the rates were 52 cents from Enid and 55.5 cents from Wichita and Beloit. The rates to Tennessee and the Carolinas, commonly known as the Carolina Territory, were 95.5 cents from Beloit, 95 cents from Wichita and 91 cents from Enid.[9]

The order of the Commission in the Southern case was first challenged by the original plaintiff herein on June 26, 1947, when its complaint was filed with the Commission. Extensive hearings were had before the Commission upon this complaint and the Commission's first report was thereafter filed.[10]

The original plaintiff herein attacked that report by a suit filed in this district. The court set aside that report and order of the Commission on the ground that the Commission had applied an improper yardstick in arriving at its conclusions and the matter was remanded to the Com-

---

2. See State of New York v. United States, 1947, 331 U.S. 284, 291, 67 S.Ct. 1207, 91 L.Ed. 1492.

   Only a minor phase of the Western, Southwestern and Southern rate structures is involved in the present case.

3. Grain and Grain Products, 205 I.C.C. 301 (1935); Supplemented 215 I.C.C. 83 (1936); Grain To, From and Within Southern Territory, 259 I.C.C. 628 (1946).

4. 205 I.C.C. 301 (1935).

5. The rates from Kansas origins were published from fourteen main narrow groups, extending northerly from the Oklahoma border to the Nebraska border, and grading upward westerly across the state. The State of Oklahoma was likewise divided into thirteen groups, and rates were fixed for each group. One group was selected as representative of each state, and similar to each other.

6. The Beloit rate was based on a flat rate to Kansas City of 18 cents, with a pro-

portional rate of 21.5 cents beyond. The Wichita, or Southern Kansas rate was a one-factor rate to Memphis which was not based on the Kansas City rate-break point.

7. 215 I.C.C. 83 (1936).

8. Grain To, From and Within Southern Territory, 259 I.C.C. 628 (1946).

9. The Beloit rate is a combination rate of the 25.5 cent flat rate to Kansas City, the 30 cent proportional rate to Memphis, and a shrinkage proportional rate of 40 cents from Memphis to Raleigh. The Wichita rate is the combination of a flat rate of 49 cents to Memphis and a 46 cent proportional rate beyond to Raleigh. The Enid rate consists of the 45 cent flat rate to Memphis and the 46 cent proportional rate beyond.

10. State Corporation Commission of Kansas v. Atchison, Topeka & Santa Fe Ry. Co., 289 I.C.C. 553 (1953).

mission for further consideration.[11] Upon reconsideration, including the taking of additional evidence, the Commission adhered to its former conclusions and filed its report, including findings.[12] The Commission found that the rates from Southern Kansas, Oklahoma, and Texas on and north of the Texas and Pacific to Memphis, as components of through combination rates to the South, were unreasonable and unduly preferential to the extent that they failed to conform to the flat rates from those states to Memphis, and that the proportional rates, lower than the flat rates, should be cancelled. The resulting lawful rates, set by the Commission, were 55.5 cents on grain originating in the entire Wichita group, including northern and southern Kansas, and 52 cents from the Enid group.

In conjunction with this finding, the Commission also found that the proportional rate of 46 cents from Memphis to Raleigh, a representative point in the Carolina Territory, applicable on Southern Kansas, Oklahoma, and Texas traffic, was unreasonable and unduly preferential to the extent that it exceeded 40 cents, and that revision of proportional rates on this traffic from Memphis to other destinations in the Carolina Territory should be made in harmony with the prescribed rate to Raleigh.

In support of its contention for an equality of rates from the Wichita and Enid groups to Memphis, as components of through combinations to the South, the original plaintiff alleges that it is unwarranted by comparison of relative distances and transportation conditions of the two groups. In addition, the State Corporation Commission contends that this court should not reconsider the former opinion, that it is res judicata, and that the Commission filed its second report without the taking of any new evidence, nor the making of new findings of fact which would support the 3.5 cent differential. The Western carriers support, in general, the contentions of the original plaintiff, and urge that the combinations on Kansas City to Memphis from Northern Kansas were prescribed, as were the rates generally in the Grain case, to satisfy the requirements of the Hoch-Smith resolution.

The defendant and the Interstate Commerce Commission contend that the findings in the Commission's report are adequate and meet all existing principles of law as it is based on the historical relationship of the involved rates, that the two regional groups present essential differences, and that such a conclusion is necessary to restore and preserve rate relationships throughout the grain territory. They also contend that the establishment of a shrinkage proportional rate for grain and grain products shipped from Oklahoma and Kansas beyond Memphis to Tennessee and the Carolinas, is within the powers of the Commission under Section 15(1) of the Interstate Commerce Act, 49 U.S.C.A. § 15(1).

The intervening Southern railroads deny that the Commission has authority under Section 15(1), in this case, to change the rates beyond Memphis as there is no injury to Kansas east of Memphis and the one cent preference should have been cured by changing rates west of Memphis, not by reducing the rate beyond by six cents and raising the rate to Memphis seven cents from Oklahoma origins.

At this juncture, two basic issues are presented: (1) whether the grain rates from the Western Territory to the Gateway of Memphis for shipments destined to Memphis, the Carolinas, and the rest of the Southern Territory, upon shipments originating in Wichita, Enid, and Amarillo, representative points in Kansas, Oklahoma, and Texas, respectively, were fixed in accordance with established principles of law, including the statement by the Commission of a rational basis for such rates; and (2) whether the Commission had the power to establish

11. State Corporation Commission of Kansas v. United States, D.C.D.Kan.1954, 128 F.Supp. 646.

12. State Corporation Commission of Kansas v. Atchison, Topeka & Santa Fe Ry. Co., et al., 301 I.C.C. 703 (1957).

696

shrinkage proportional rate under Section 15(1), in this case, for shipments destined to Tennessee and the Carolinas, originating in Oklahoma and Kansas, where the title complainant alleged undue preference on rates to Memphis and the entire South from such areas.

■■ Under the doctrine of administrative finality, the scope of judicial review is very limited. Administrative orders entered by the Commission .in the exercise of its power are not to be overturned on judicial review unless they exceed constitutional limits, are based upon a mistake of law, are made without a hearing, are unsupported by the evidence, or for some other reason amount to an abuse of power.[13]

■■ As the record relative to the proceedings before the Interstate Commerce Commission is not before the Court, the complainant cannot challenge the order on the ground of insufficient evidence. It is a settled principle of law that the findings of the Commission may not be assailed upon appeal in the absence of the evidence upon which they were made.[14] Under the contentions of the complainant, there remains but one consideration for the Court to determine in the present case. Is there a rational basis for the action of the Commission? Admittedly, the judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the Commission.[15]

■ The basis, if any, for the Commission's conclusions is found in the report itself.[16] The Commission may file its report in a narrative fashion as it need not state separately its findings of fact and conclusions of law which is required of the courts.[17] It is sufficient if the report and findings of the Commission considered in composite express in a clear and understanding manner the conclusions of the Commission.[18] The findings are made by law prima facie true, which findings have the strength due to judgments of a tribunal appointed by law and informed by experience.[19] As the findings are prima facie true, the burden of proof is upon the complainant to establish that the existing freight rates are preferential to Enid and prejudicial to Wichita within the meaning of Section 3(1) of the Interstate Commerce Act.[20]

■ The issue is narrowed to one of prejudice to the Kansas Groups and preference to Oklahoma points. The parties agree that authority for the order must be found in Section 3(1).[21] This Section forbids the establishment of a rate structure which would give one locality an "undue preference" and would subject another locality to an "undue prejudice." However, as noted in Board of Trade of Kansas City, Mo. v. United States, 1942, 314 U.S. 534, 546, 62 S.Ct. 366, 372, 86 L.Ed. 432, "this does not mean that the law compels identity of treatment for like services at different places. It prohibits only 'undue' or 'unreasonable' dis-

13. Board of Trade of Kansas City, Mo. v. United States, 1942, 314 U.S. 534, 546, 62 S.Ct. 366, 86 L.Ed. 432; United States v. Chicago Heights Trucking Co., 1940, 310 U.S. 344, 352–353, 60 S.Ct. 931, 84 L.Ed. 1243; Manufacturers R. Co. v. United States, 1918, 246 U.S. 457, 481, 38 S.Ct. 383, 62 L.Ed. 831.

14. United States v. Northern Pacific R. Co., 1933, 288 U.S. 490, 499, 53 S.Ct. 406, 77 L.Ed. 914; Nashville, Chattanooga & St. Louis, Railway v. State of Tennessee, 1923, 262 U.S. 318, 324, 43 S.Ct. 583, 67 L.Ed. 999.

15. Mississippi Valley Barge Line Co. v. United States, 1934, 292 U.S. 282, 287, 54 S.Ct. 692, 78 L.Ed. 1260.

16. See note 12, supra.

17. Meeker v. Lehigh Valley R. Co., 1915, 236 U.S. 412, 428, 35 S.Ct. 328, 59 L.Ed. 644.

18. Alabama Great Southern R. Co. v. United States, 1951, 340 U.S. 216, 227–228, 71 S.Ct. 264, 95 L.Ed. 225.

19. Illinois Central R. Co. v. Interstate Commerce Commission, 1907, 206 U.S. 441, 454, 27 S.Ct. 700, 51 L.Ed. 1128.

20. Louisville & Nashville R. Co. v. United States, 1915, 238 U.S. 1, 11, 35 S.Ct. 696, 59 L.Ed. 1177.

21. See footnote 2, supra.

criminations." The Commission found, as a question of fact, that there was no undue discrimination. Is this finding supported by adequate factors and reasons in the report itself?

First, it is contended that the length of haul, under similar transportation conditions, from two highly competitive areas, demands equality of treatment in the establishment of grain rates. The distance from the origins in these two representative groups to Memphis was computed by the use of simple and weighted average distances.[22] The distances computed on the basis of weighted-average miles are based on the production of wheat only, whereas the rates in issue apply to all kinds of grain. It also assumes that all grain moves to Memphis, or the South. Simple-average distances gives a criteria for all grain. But whether one or the other is used, neither basis is decisive. The factor of distance, when comparing two different groups or regions, is not controlling.[23] Differences in competitive conditions may justify a relatively lower rate over one line than over another.[24]

Some contention is made that United States v. Illinois Central R. Co., 1924, 263 U.S. 515, 44 S.Ct. 189, 68 L.Ed. 417, requires equality of treatment. That case merely held that in a situation where the railroads established a uniform rate within a certain area, a railroad could not exact a higher rate from a point within that territory. But here, the important comparison is in the *regional* or *group* differentials.[25] That is, the relationship of interterritory, not intraterritory rates as was involved in the Illinois Central case.

The Commission relied upon the historical rates set by the railroads prior to the first Grain case. Prior to 1935, the grain rates from Enid, Wichita and Beloit to Memphis, as established by the railroads, were 31.5, 36 and 39.5 cents, respectively. If the Commission maintains the same ratio of difference as that made by the carriers themselves, such an order is within its power.[26] These prior existing rates are proper matters for consideration in establishing new through rates.[27]

Also, the Commission placed great emphasis upon the grain rate structure as a whole and the interrelationship of the various grain rates. On traffic to the South the rates from the various Kansas groups are not based on the distance to Memphis, but are influenced largely by the level of the gathering rates to Kansas City. Similar conditions prevail from other origins.[28]

To escape the effect of the interrelated grain rate structure via rate-break points, the complainant proposes a system of single-factor reduced rates from Kansas and Nebraska, with constant balance applying on movements beyond Kansas City for shipments destined to Memphis and beyond. Obviously, this contention is not sound. On traffic from various origins not embraced in the complaint, such as Missouri, Iowa, and South Dakota, there would be serious rate maladjustments.[29] The rate relationship of Kansas and Oklahoma must be viewed as

22. Simple-average distances are straight averages without including in the calculation the production from the respective groups. The so-called weighted or bushel-mile averages take into consideration the production of wheat from the respective groups. See 301 I.C.C. 703, 716 (1957).

23. Ayrshire Collieries Corp. v. United States, 1949, 335 U.S. 573, 588, 69 S.Ct. 278, 93 L.Ed. 243.

24. L. T. Barringer & Co. v. United States, 1943, 319 U.S. 1, 7, 63 S.Ct. 967, 87 L.Ed. 1171.

25. See Ayrshire Collieries Corp. v. United States, 1949, 335 U.S. 573, 590, 69 S.Ct. 278, 93 L.Ed. 243.

26. Interstate Commerce Commission v. Union Pacific R. Co., 1912, 222 U.S. 541, 551, 32 S.Ct. 108, 56 L.Ed. 308.

27. Western Paper Makers' Chemical Co. v. United States, 1926, 271 U.S. 268, 271, 46 S.Ct. 500, 70 L.Ed. 941.

28. See Table in 301 I.C.C. 703, 745 (1947).

29. Id, at 740.

a part of the whole network. Only a portion of the national structure is before this court. And since the Kansas and other Western Territory points break over Kansas City, the relationship within that area must be preserved.

■ The complainant contends also that the former opinion was sound, is res judicata, constitutes a bar to the present suit, and since the only evidence taken, if any, was cumulative, there is no new evidence to support the present order and it is, therefore, subject to the same infirmities which the court found to inhere in the first decision of the Commission. The contention of res judicata is without merit. We are here concerned with the second report, not with the original decision. In the former case, it was merely held that in relying upon the factor of distance, the Commission applied an erroneous yardstick, and that the other factors upon which the Commission may have relied were not sufficiently clear, from the findings, for a proper review of the report. The first decision was sound. Here we have a new report. The sole issue is whether the Commission has enumerated a rational basis upon which its conclusions were reached. In the report under consideration, the Commission took into account multiple factors appropriate for consideration. It took into account the factors of distance, historical relationship, the general rate-break plan, interrelationship of the rates in question, and considered the controversy between these minor areas of two different major rate territories in light of the whole national grain rate structure. It gave weight to the fact that on traffic to the South, the rates from various Kansas groups were not based on the distances to Memphis, but were influenced largely by the level of the gathering rate to Kansas City; and that no like influence affected the rates from the Enid group to Memphis. It considered the maintaining of interrelationship of the major grain rate territories in respect to rates as one of delicate balance and sensitivity. The Commission concluded from a consideration of these factors and others that the 3.5 cent differential in favor of Enid over Wichita was not an undue preference to Enid nor unduly prejudicial to Wichita. These factors, not set out by the Commission in its prior report, remove the infirmities which were found in the first report.

■ The substance of all the decisions arising under Section 3 of the Act is that the Commission is only bound to give the same terms to all persons alike under the same conditions and circumstances, and that any fact which produced an inequality of condition and a change of circumstances justifies an inequality of charge. Congress has confided the determination of the question of discrimination to the Commission, a tribunal with an informed administrative judgment in such complex matters. It is not within the power of this court to inquire as to the wisdom of the decision of the Commission. The solution remains within the choice of the expert body. As noted in Board of Trade of Kansas City, Mo. v. United States, 1942, 314 U.S. 534, 548, 62 S.Ct. 366, 372, 86 L.Ed. 432, "We certainly have neither technical competence nor legal authority to pronounce upon the wisdom of the course taken by the Commission. It is not for us to tinker with so sensitive an organism as the grain rate structure only a minor phase of which is caught in the record before us. If we were to grant the relief sought by the appellants, we would be restoring evils which the exclusive rate-break adjustment designed to remove— evils which, for all we know, would be far more serious than those complained of by the appellants." [30] The conclusions were reached after a full hearing, are within the constitutional limits of its powers, supported by the evidence, and we are unable to say that they show an abuse of discretion.

■ The second question presented is whether the Commission, under the is-

30. See Northern Pacific R. Co. v. United States, 1942, 316 U.S. 346, 349, 62 S.Ct. 1166, 86 L.Ed. 1521.

sues presented to it by the complainants and its finding may order a reduction in the rates beyond Memphis destined to the Carolina Territory? The Southern railroads contend that the Commission was without jurisdiction because they were not properly brought before the Commission. This argument is without merit. It is clear from the record that they appeared before the Commission, made arguments, filed petitions for reconsideration, and have intervened in the instant action.

The Commission prescribed a 55.5 cent rate for both Wichita and Beloit, on all grain destined to Memphis and beyond to the South. After returning the entire area of Kansas to the Kansas City rate-break point as it existed prior to the Southern case, this uniform rate was required. The Enid rate was set at 52 cents for all shipments to and beyond Memphis. This established uniform rates on all shipments whether destined to or beyond Memphis.

Once the Commission returned the whole State of Kansas to "break" over Kansas City, then both the Southern and Northern Kansas rates to the Carolinas via Memphis were combination rates to Memphis, and a shrinkage proportional rate of 40 cents beyond Memphis to Raleigh. Although the Southern carriers now only receive 40 cents instead of 46 cents upon shipments destined to the Carolinas from Southern Kansas, this result is necessary once the Commission returned Southern Kansas to its status existing prior to the Southern case.

The Commission also reduced the proportional rate on shipments from Enid to the Carolinas via Memphis from 46 to 40 cents. This was necessary when the Commission concluded that the present relation of rates to Memphis, as components of through rates to the South, was unduly preferential to Southern Kansas, Oklahoma, and Texas, and unduly prejudiced Northern Kansas, Nebraska, Colorado, Idaho, Utah, and Southern Oregon.

The intervening Southern railroads contend that the Commission is without power to reduce the proportional rate on shipments east of Memphis originating in these areas in a Section 3(1) case, because the rates are not in issue in a rate relation proceeding. This contention overlooks the fact that the Commission found the relation of rates between Beloit, Wichita, and Enid, on shipments destined to the entire South, to be in violation of Section 3(1). The Commission had the power under Section 15(1) of the Act to prescribe a just and reasonable rate once it found that the rate charged was unjustly discriminatory and that a just and reasonable result could be obtained only by the establishment of a particular rate.[31] This power of the Commission to prescribe reasonable rates applies alike to all rates, be they joint, local, or proportional.[32] The Commission found that the normal proportional rate of 46 cents from Memphis to Raleigh, when applied to grain and grain products originating in Southern Kansas, Oklahoma, and a portion of Texas, was unreasonable and unduly prejudicial to the extent that it exceeded 40 cents, and that revision of proportional rates on this traffic from Memphis to other destinations in the Carolina Territory should be made in harmony with the prescribed rate to Raleigh. Upon the basis of the finding, it was within the range of power of the Commission under Section 15(1) to establish through rates to Raleigh and to eliminate existing preference and prejudice by reducing the related rate from Memphis to Raleigh.

An appropriate decree should be prepared and submitted by counsel for the defendants in accordance with the views

31. See Ayrshire Collieries Corp. v. United States, 1949, 335 U.S. 573, 593–594, 69 S.Ct. 278, 93 L.Ed. 243; State of New York v. United States, 1947, 331 U.S. 284, 340–343, 67 S.Ct. 1207, 91 L.Ed. 1492.

32. Atchison, Topeka & Santa Fe R. Co. v. United States, 1929, 279 U.S. 768, 776, 49 S.Ct. 494, 73 L.Ed. 947.

expressed herein, vacating the stay order and dismissing the action.

HUXMAN, Circuit Judge (dissenting).

I agree with Commissioner Minor that "this report is subject to the same infirmities which moved the court to remand the case to the Commission for further consideration." See 128 F.Supp. 646. Nothing is changed. True, the Commission devotes more discussion in general terms to historical background. Historical background is important only if it logically bears upon the problem presented. Talking in general terms of historical background, as discussed by the Commission, does not answer to my satisfaction the question why one trade territory the same distance from a common market and having the same transportation conditions is saddled with a 3.5 cent greater freight rate than that of an adjoining competing territory. Neither does the statement that the relationship of Kansas and Oklahoma must be viewed as a part of the over-all network, and that since the Kansas and other western territory points break over Kansas City the relationship within that area must be preserved, justify this discrimination between two highly competitive areas. The fact remains that the Enid territory and the Wichita territory are highly competitive territories, entitled to equality of treatment as between themselves. If preserving the relationship of the territories breaking on Kansas City requires an unjust discrimination in rates against Wichita, there is maladjustment in that over-all relationship which must be corrected otherwise than by destroying or seriously impairing Wichita's economic life with respect to the Memphis route.

In its former hearing and consideration, the Commission used the weighted average method of determining the distance from Enid and Wichita to Memphis. By the use of this method, it found the distance from Wichita to be 18.3 miles less than from Enid; notwithstanding, it gave Enid a 3.5 cent lower freight rate. Although the Commission has consistently employed the weighted average method as a yardstick for comparing distances, upon remand it now abandoned that method and for the first time employed the simple average mileage yardstick. By the use of this method, it now finds the distance from Enid to Memphis to be 12 miles less than from Wichita. But whether the distance from Wichita is 18.3 miles less or 12 miles greater, the Commission still finds that Enid should enjoy the benefit of a 3.5 cent less freight rate. No one would seriously contend that the difference in distance, whichever method is used, is a factor justifying a difference of 3.5 cents in freight rates.

The Commission did one other thing apparently to justify adherence to its former rates for Wichita and Enid. It took a look at the Revised Southwest Scale rates on grain and grain products. It may be noted the Revised Southwest Scale rate does not establish rates, it only suggests permissible rates; neither did the Commission adopt the suggested rates established thereby. It merely looked at them, talked about them, and then readopted its former rates penalizing Wichita 3.5 cents over its competing territory; both for all practical purposes being the same distance from Memphis.

It is true that our scope of review of an order of the Commission is a limited one, but it is still a judicial review and not merely a perfunctory one. In Interstate Commerce Commission v. Illinois Central R. Co., 215 U.S. 452, 30 S.Ct. 155, 160, 54 L.Ed. 280, the Supreme Court said that we have power to inquire "whether, even although the order be in form within the delegated power, nevertheless it must be treated as not embraced therein, because the exertion of authority which is questioned has been manifested in such an unreasonable manner as to cause it, in truth, to be within the elementary rule that the substance, and not the shadow, determines the validity of the exercise of the power." It would seem elementary that one of two competing territories for a common mar-

ket cannot successfully compete under a freight rate 3.5 cents greater than its competitor. Such a disparity in rates would, upon its face, seem unreasonably discriminatory unless some justification appeared therefor. I can find none in this record to justify such a discrimination in two territories the same distance from a common market and whose transportation conditions are identical, and must, therefore, conclude that the shadow and not the substance determined the establishment of the challenged rates.

I would enjoin the enforcement of the challenged rates.