## NORTHERN PAC. RY. CO. et al. v. UNITED STATES et al. (NORTHWEST PETROLEUM ASS'N et al., Interveners).

### No. 2444.

District Court, D. Minnesota, Third Division.
July 19, 1932.

M. L. Countryman, Jr., of St. Paul, Minn., and A. H. Lossow, of Minneapolis, Minn. (J. N. Davis and P. F. Gault, both of Chicago, Ill., and R. J. Hagman, J. P. Plunkett, D. F. Lyons, and F. G. Dorety, all of St. Paul, Minn. on the brief), for petitioners.

Elmer B. Collins, Sp. Asst. to Atty. Gen. (Lewis L. Drill, U. S. Atty., of St. Paul, Minn., and John Lord O'Brian, Asst. to Atty. Gen., on the brief), for the United States.

E. M. Reidy, of Washington, D. C. (Daniel W. Knowlton, of Washington, D. C., on the brief), for the Interstate Commerce Commission.

Karl Knox Gartner, of Washington, D. C., and Elwin E. Hadlick, of Minneapolis, Minn., for intervener Northwest Petroleum Association.

Garberg & Johnson, of Fargo, N. D., for the interveners Farmers' Union Co-Operative Oil Company, et al.

The suit, being one to enjoin and annul an order of the Interstate Commerce Commission, was heard before a court of three judges, consisting of JOHN B. SANBORN, United States Circuit Judge, WILLIAM A. CANT, United States District Judge, and GUNNAR H. NORDBYE, United States District Judge.

## PER CURIAM.

The petitioners are common carriers in interstate commerce whose lines are situated in what is termed "western trunk line territory," which comprises the states of Illinois, Iowa, Nebraska, Wisconsin, Minnesota, North Dakota, and South Dakota. The states of Missouri, Kansas, Oklahoma, and Texas and portions of Louisiana and Arkansas form what has been referred to in this case as the "midcontinent oil field." That field produces great quantities of gasoline and petroleum products which in part are shipped to, and consumed in, western trunk line territory. Some of it moves by rail and some by pipe line. In portions of the territory, therefore, pipe lines are in competition with the railroads, and railroad rates on gasoline and other products of petroleum are affected thereby. In other portions, rates are unaffected, or only slightly affected, by such factor. The reasonableness of rates from the midcontinent field to the destination territory here referred to, the relationship of rates prevailing from the midcontinent field to one section of the territory, to rates from that field to another section, and the relationship of rates from the midcontinent field to rates from other competing fields into this destination territory, have been given much consideration by the Interstate Commerce Commission. See Midcontinent Oil Rates, 36 I. C. C. 109; Midcontinent Oil Rates 1925, 112 I. C. C. 421; Midcontinent Oil Rates 1925, Second Supplemental Report, 139 I. C. C. 605.

This suit was brought to enjoin an order of the Commission entered December 1, 1931, upon a rehearing had in January, 1930, in docket No. 17304, International Oil Co. et al. v. Abilene & Southern Railway Co. et al., and upon a separate hearing had in March, 1929, in docket No. 21737, Dacotah Oil Co. et al. v. A., T. & S. F. Ry. Co. The title case, No. 17304, was instituted July 15, 1925, by persons engaged in the oil business in various places in North Dakota and Western Minnesota, asserting that the rates on petroleum products from the midcontinent field were and would continue to be unjust and unreasonable, in violation of section 1 of the Interstate Commerce Act (49 USCA § 1). The proceedings known as No. 21737 were commenced by the Dacotah Oil Company on November 30, 1928, by a complaint which asserted that rates prescribed by the Commission in No. 17304 from the midcontinent field to Buffalo, Valley City, Jamestown, and Cleveland, N. D., were unjust and unreasonable.

No. 17304 was originally heard in October, 1925. The Commission issued its report March 5, 1928 (Midcontinent Oil Rates 1925, Second Supplemental Report, 139 I. C. C. 605), which covered not only the issues in No. 17304, but also the issues in another proceeding, No. 16309, South Dakota Independent Oil Jobbers Association v. A., T. & S. F. Ry. Co., et al., in which the lawfulness, under sections 1 and 3 of the Interstate Commerce Act, of rates on petroleum products from the midcontinent field to points in South Dakota were challenged, and which also covered certain reserved issues in a consolidated proceeding known as Midcontinent Oil Rates 1925, which called in question the lawfulness, under sections 1, 2, and 3 of the act (49 USCA §§ 1–3), of rates on gasoline and petroleum products from the midcontinent field to western trunk line territory. In its report and order of March 5, 1928, the Commission prescribed specific rates from points in the midcontinent field to representative destinations in South Dakota, North Dakota, and Northwestern Minnesota, and ordered them established on June 14, 1928, upon a finding that the existing rates were and would be unreasonable and unduly

prejudicial to the extent that they should exceed the rates prescribed. The Commission stated that the prescribed rates "had for their purpose the creation of a more consistent and reasonable relationship of rates between those points and other points in western trunk line territory." The rates prescribed and related rates to other destinations in South Dakota, North Dakota, and Northwestern Minnesota became effective June 14, 1928.

On May 4, 1928, the petitioners filed with the Commission an application asking it to postpone the effective date of its order of March 5, 1928, and to reopen Midcontinent Oil Rates 1925, and to grant them a further hearing upon a single record with respect to the level of the rates from the midcontinent field to destinations in Nebraska, Iowa, South Dakota, North Dakota, and Minnesota. This application was denied February 11, 1929.

In the summer of 1928, the Commission suspended certain tariffs filed by these carriers proposing reductions in rates from refining points in the Wyoming oil field to destinations in South Dakota, North Dakota, Iowa, and Minnesota, which proposed to restore the relationship existing prior to June 14, 1928, between rates from the Wyoming field to the destination territory here involved and those from the midcontinent field. After an investigation and hearing, the Commission ordered the suspended tariffs canceled on the ground that the proposed rates would disturb the relationship existing between the rates from the Wyoming and midcontinent fields established by its Second Supplemental Report in Midcontinent Oil Rates 1925, and would result in undue and unreasonable prejudice and disadvantage to shippers and localities in the midcontinent field, contrary to section 3 of the act.

The complaint of the Dacotah Oil Company filed November 30, 1928, No. 21737, was heard by the Commission at Jamestown, N. D., on March 6, 1929. By order of June 10, 1929, the Commission opened No. 17304 for further hearing at Fargo on January 13, 1930.

After the Commission had reopened docket No. 17304, the Standard Oil Company of Indiana and the Public Service Commission of Wyoming filed complaints charging that rates from Wyoming on petroleum and its products to points in North Dakota, South Dakota, Iowa, and Minnesota were unjust and unreasonable as compared with such rates from the midcontinent field, and unduly prejudicial to shippers and producers in Wyoming, and unduly preferential to those located in the midcontinent field. Upon notice from the Interstate Commerce Commission that No. 17304 was assigned for hearing at Fargo, N. D., on January 13, 1930, counsel for the petitioners requested a postponement in order that the proceeding might be consolidated with pending complaints attacking the relationship between the rates from the midcontinent field and those from Wyoming. The request was denied. The petitioners, on January 3, 1930, filed a formal petition asking the Commission to consolidate the proceedings for hearing and decision upon a common record, and to postpone the hearing set for January 13, 1930, at Fargo in No. 17304. On January 14, 1930, they filed a petition with the Commission to reopen Midcontinent Oil Rates 1925 for further hearing with respect to the rates prescribed from the midcontinent field to Lincoln and Omaha, Neb., Des Moines, Fort Dodge, Sioux City, and Mason City, Iowa, Sioux Falls, S. D., and St. Paul and Duluth, Minn., and to territory beyond such gateway points, and to consolidate with such proceedings the Wyoming complaint and Nos. 17304 and 16309, and all other complaints pending involving the rates on petroleum products from all producing points to said destinations for hearing upon a single record. These petitions were denied on April 14, 1930.

The order of December 1, 1931, prescribes reduced rates effective March 15, 1932, in lieu of rates previously prescribed by the Commission and made effective June 14, 1928, for the transportation of gasoline and petroleum products, taking the same rates in carloads from points in the midcontinent field to destinations in North Dakota and in that part of Minnesota lying north and west of the Great Northern Railroad from Duluth to Pipestone, Minn. The old rates and the reduced rates are found in Appendix B, on pages 448 to 460 of the Commission's report.

The record upon which the order of December 1, 1931, which is here complained of, was based, was closed January 15, 1930. Since that time, the financial condition of the carriers has been seriously affected by changed economic conditions recognized both by the Commission and by the courts. See Fifteen Per Cent Case 1931 (Ex parte Number 103, In the Matter of Increases in Freight Rates and Charges) 178 I. C. C. 539; A. T. & S. F. Ry. Co. v. United States, Interstate Commerce Commission et al., 284 U. S. 248,

52 S. Ct. 146, 76 L. Ed. 273. An affidavit of the Assistant General Auditor of the Northern Pacific Railway Company, submitted in support of the application for a preliminary injunction, indicates that, so far as his road was concerned, the effects of the change in economic conditions did not manifest themselves until the end of 1930, but were plainly evident by the end of 1931; that the revenues of the Northern Pacific declined from $77,000,000 in 1929 to $65,000,000 in 1930, and to $51,000,000 in 1931. The general effect of the change in economic conditions upon the revenues of these and other carriers is a matter of common knowledge.

On February 3, 1932, the petitioners filed with the Commission a petition in their own behalf and on behalf of the other defendants in Nos. 17304 and 21737, asking the Commission to vacate or to postpone the effective date of the order of December 1, 1931, and to grant them a rehearing and reconsideration thereof, and to reopen the proceedings for the taking of further evidence in order to permit the defendants to show changed conditions, and for such other and further relief as might be just and proper. The petition for rehearing set forth the changed economic conditions, the fall in revenue, the facts as to the movement of petroleum products, asserted that rates on such products could reasonably be raised without burdening the traffic, and set forth the effect which the order reducing rates would have upon the carriers' revenues, indicating that it would mean a total loss in revenue to the carriers affected of some $600,000. On March 7, 1932, the Commission denied the petition, and the carriers were obliged to put into effect the rates prescribed in the order.

The petitioning carriers then instituted this suit and applied for a preliminary injunction. In support of the motion for such injunction, affidavits were filed, for the purpose of showing the effect of the order of the Commission upon the revenues of the carriers, and that shippers of petroleum products from the midcontinent field to the destination territory might reasonably be required to pay higher rates than those fixed by the order of the Commission.

Since the questions involved are questions of law, the record upon which the Commission entered its order of December 1, 1931, not being before us, counsel agreed that the case should be finally determined without another hearing.

The contentions of the petitioners with respect to the order of December 1, 1931, are substantially these:

(1) That the Commission proceeded upon a misconception of the law and of its powers and duties, and exceeded its powers. This contention is based upon the claim that it appears upon the face of the Commission's report that in requiring the rates prescribed by it as just and reasonable and otherwise lawful, to be reduced on March 5, 1932, it did not act in the exercise of the authority conferred upon it by law to determine whether said rates would for the future be just and reasonable in and of themselves with regard to the service rendered, but proceeded upon the erroneous assumption that arbitrary power was conferred upon it to reduce rates which were otherwise just and reasonable, in order to bring about what it conceived to be reasonable and consistent relationships to other rates prescribed by the Commission with relation to depressed competitive rates conceded by it to be not representative of maximum reasonable rates, and to do this without having before it any issues of unjust discrimination or undue or unreasonable preference or prejudice and without making any findings of discrimination or undue or unreasonable preferences or prejudices.

(2) That the hearing granted to the carriers was inadequate and manifestly unfair and that the conduct of the proceedings by the Commission and its action in the premises was so arbitrary and unreasonable as to amount to a denial to the petitioners of due process of law, in violation of the Fifth Amendment to the Constitution of the United States. This contention is based principally on the denial by the Commission of the various petitions and requests by the carriers, namely, the petition to postpone the effective date of the order of March 5, 1928, and to reopen Midcontinent Oil Rates 1925, to grant a further hearing upon a single record with respect to the level of rates from midcontinent field to destinations in Nebraska, Iowa, North Dakota, South Dakota, and Minnesota, denied by the order of February 11, 1929; the request that the hearing in No. 17304 set for Fargo on January 13, 1930, be postponed in order that that proceeding might be consolidated with the pending complaints attacking the relationships between the rates from the midcontinent field and the rates from Wyoming; the petition of January 3, 1930, asking for such consolidation

and for the postponement of a hearing in No. 17304; the petition of January 14, 1930, to reopen Midcontinent Oil Rates 1925, for further hearing with respect to rates prescribed from the midcontinent field to Lincoln and Omaha, Neb., Des Moines, Fort Dodge, Sioux City, and Mason City, Iowa, Sioux Falls, S. D., and St. Paul and Duluth, Minn., and to territory beyond such gateway points, and to consolidate with said proceeding the Wyoming complaints; the petition of February 3, 1932, to set aside or stay the effect of the order of December 1, 1931, and to grant a rehearing on account of changed conditions.

It is asserted that the denial of the requests to reopen Midcontinent Oil Rates 1925, and to reopen the proceedings in which rates from the midcontinent field to South Dakota had been prescribed, and to consolidate these proceedings for hearing and decision with docket Nos. 17304 and 21737, involving the rates to North Dakota and Northwestern Minnesota, precluded the petitioners from securing any correction by the Commission of any rate relationships which the Commission might deem improper as between the rates to North Dakota and Northwestern Minnesota, on the one hand, and the rates previously prescribed from the midcontinent field to destinations in South Dakota, Iowa, or Southeastern Minnesota, except by a reduction in the former rates, and that thereby the Commission denied to the petitioners a fair hearing upon the question of the inherent reasonableness of the rates to North Dakota and Northwestern Minnesota; that, in like manner, the Commission, by denying the consolidation of issues in Nos. 17304 and 21737 with the Wyoming complaints for hearing and decision upon one record, precluded a correction of any rate relationships which the Commission might find to be unlawful as between rates from Wyoming and rates from the midcontinent field; that the Commission arbitrarily confined its consideration of rate relationships to those between the rates assailed and the rates previously prescribed from the midcontinent field to destinations in South Dakota and other portions of western trunk line territory. With respect to the denial of the petition to vacate or stay the order of December 1, 1931, on account of the changed economic conditions, the petitioners say: "It is the contention of petitioners that in denying said petition, and, by so doing, requiring the order, based upon records which had ceased to be representative of present or future conditions, to become effective, without regard to the financial condition of the carriers or to the inherent reasonableness either of the rates prescribed or of the rates to which the Commission related them, the Commission acted so arbitrarily and unreasonably as to render its order void."

Reduced to its lowest terms, this controversy involves two questions: (1) Does the record before us show that the Commission exceeded its powers? (2) Were the petitioners granted a fair hearing?

█ We cannot go behind the report and order of the Commission, and must answer the first question from an examination of the report.

The Commission says: "In our former report (Second Supplemental Report in Midcontinent Case of 1925) we also prescribed maximum reasonable rates from the midcontinent field to a number of points in adjacent territory in South Dakota reached by the lines of two of the principal defendants operating in the destination territory. The latter are relatively higher, particularly those to points west of the Missouri River, than the rates to Sioux City, Willmar, St. Paul, and the other gateways. In Appendix A hereto the rates and short-line distances to those gateways and to representative points in the destination territory are compared with the rates prescribed to the South Dakota points, using the first-class rates under the southwestern scale as a basis of comparison."

The Commission further says:

"Defendants contend that the rates assailed should not be measured by the rates prescribed to South Dakota because the traffic here considered does not normally move through that State; because the rates thereto bear no necessary relation to those to North Dakota; and because they are unduly low. The first two grounds relied upon were not recognized in recent decisions in which we prescribed a uniform level of rates on traffic from the Southwest to the eastern sections of both States. Nor does defendants' comparison of the rate to Mitchell, S. Dak., with rates from Tulsa, Okla., to points in Indiana prescribed in Indiana State Chamber of Commerce v. A., T. & S. F. Ry. Co., 96 I. C. C. 485; Id., 112 I. C. C. 481, lend support to the latter conclusion. The rate to Mitchell is on a somewhat lower level than the average of the rates to South Dakota, and distances from Tulsa to the Indiana destinations are not representative of those from all producing points in Group 3.

"Complainants and defendants introduced exhibits showing relative traffic density and other statistical data bearing upon transportation conditions in the territory between Kansas City and St. Paul through which the traffic generally moves, in the destination territory here considered, and in South Dakota. Complainants contend that their comparisons fully sustain the reasonableness of the rates which they seek, both for the future and for the past, and that they justify a level of rates in western North Dakota no higher than in the eastern portion of that State. Defendants stress the operating difficulties encountered by the northern lines during the winter months and the character of the service which they render in the distribution of the traffic. In the latter connection the Northern Pacific shows that of 2,465 cars delivered by it in the first eight months of 1929, 45 per cent. were destined to branch-line points. On the other hand, by far the heaviest movement takes place in the summer and early fall months, and the lines performing the service to the Twin Cities handle the traffic in train loads to that point."

Under the heading "Rates for the Future," the Commission says: "The record on further hearing demonstrates the necessity of a further revision of the rates assailed to bring about a reasonable and consistent adjustment. The present rates grade up too rapidly beyond the gateways on the eastern border of the destination territory; * * * the rates to North Dakota especially are on too high a level compared with the rates prescribed to South Dakota: and those from Kansas City to North Dakota are generally higher than the Wyoming-Montana scale recently prescribed in Rates on Petroleum and its Products in Montana, 176 I. C. C. 707."

Under the heading "Findings" appears the following language: "Upon the whole record now before us, we find that the rates assailed prior to June 14, 1928, were not unreasonable; * * * and that on and after the effective date of our order for the future, the rates assailed will be unreasonable to the extent they exceed or may exceed those shown from Group 3 in column F of Appendix B, plus or minus said differentials from the other origin groups. Our previous findings are modified accordingly."

The Commission refused to grant reparation to the complainants in No. 17304 except in certain specific instances, and confined itself to ordering reduction of rates for the future. Three commissioners dissented.

In his dissenting opinion, Commissioner Mahaffie says: "The principal issue here, as I view it, is one of the relationship in the rates resulting from our previous decisions. The adjustment here required is based very largely upon our previous findings in the Midcontinent Cases, which we have repeatedly stated required rates below reasonable maxima. Notwithstanding the fact that many of the rates assailed were published in compliance with our orders, the majority now use the southwestern class rate revision for comparative purposes to arrive at a conclusion that rates previously prescribed were unreasonable. The record is convincing that the rates assailed in the territory considered should be more properly aligned. That should be done without sacrifice of carrier revenue. Revision of rate adjustments upon such precedents as the majority here use and the condemnation of rates previously prescribed as reasonable usually result, as they result here, in rates so low as to make unwarranted reductions in carrier revenue."

It seems quite evident from the language of the report that the complainants before the Commission urged the propriety of taking the South Dakota rates as a basis of comparison—while the railroads claimed that such rates afforded an improper basis because they were too low and for other reasons. It must, we think, be assumed, in the absence of the record upon which the report was based, that the Commission was justified in reaching the conclusion which it evidently did reach, that the South Dakota rates, at the time of the hearing, represented reasonable maxima, and that they did therefore furnish a proper basis for determining the reasonableness of the rates assailed.

The dissenting opinion of Commissioner Mahaffie indicates that in his opinion the report of the majority of the commissioners resulted from relating the assailed rates to the South Dakota rates which he considered too low to furnish a proper basis of comparison. His opinion is consistent with the theory that the Commission was interested only in fixing rates which were relatively reasonable, without regard to whether they were compensatory for the service rendered; and it is also consistent with the theory that the majority of the commissioners were of the opinion that the South Dakota rates represented reasonable maxima and that the North Dakota rates were out of line.

■■ It is true, as pointed out by the petitioners, that the Commission had previously said that the rates to South Dakota were below reasonable maxima. That, however, would not foreclose the Commission, at a later time, from changing its mind and reaching another conclusion upon a different record. What we are asked to do is to find from the language of the report that the Commission entirely disregarded the reasonableness of the rates as such, and proceeded upon the theory that it might arbitrarily relate these rates to other rates, although it knew the latter to be less than those which might reasonably be charged for the service rendered. We do not think that we would be justified in so finding. The issue as to whether these rates were reasonable was squarely before the Commission. In determining that question, it had the right to compare the rates assailed with other rates which in its judgment formed a proper basis of comparison. See Interstate Commerce Commission v. Louisville & Nashville R. R. Co., 227 U. S. 88, 98, 33 S. Ct. 185, 189, 57 L. Ed. 431, in which the court said, speaking of evidence of other rates than those in question: "The value of such evidence necessarily varies according to circumstances, but the weight to be given it is peculiarly for the body experienced in such matters and familiar with the complexities, intricacies, and history of rate making in each section of the country. So, too, the fact that a commodity rate is low may cast some light on the reasonableness of the higher rate on the class from which that commodity was taken or to which it might legally be restored."

See, also, Louisville & Nashville R. R. Co. v. United States, 238 U. S. 1, 12, 35 S. Ct. 696, 698, 59 L. Ed. 1177, from which we quote the following language: "The same is true of determining, by comparison, the reasonableness of freight charges. Until some standard is adopted they may prove nothing —even where the two hauls are over the same mileage. For the rate attacked may tend to show that the others are too low—while they in turn might be relied on to prove that the first is too high. Both may be unreasonably high, or too low, because compelled by conditions over which the carrier had no control. Water competition, rail competition, and competition of markets, enter so largely into the establishment of rates that mere distance is not necessarily a determining factor; indeed, the statute itself recognizes that there may be circumstances under which it is lawful to charge less for a long haul than for a short haul over the same road. But while all this be true, it is, nevertheless, a fact that a comparison of rates between two points on the same road, or with the charges on other roads, may furnish evidence of probative value."

The following language appears on page 15 of 238 U. S., 35 S. Ct. 696, 700: "Giving the widest possible effect to the fact that mere comparison between rates does not necessarily tend to establish the reasonableness of either, it is still true that, when one of many rates is found to be higher than all others, there may arise a presumption that the single rate is high. And when to that is added the fact that some of the comparative and lower rates had been prescribed by the Commission, there was at least a prima facie standard which, after allowing for dissimilarity in conditions, might be used along with all the other evidence in order to test the reasonableness of the Nashville rate."

In Western Paper Makers' Chemical Co. v. United States, 271 U. S. 268, 271, 46 S. Ct. 500, 501, 70 L. Ed. 941, the court said on the same subject: "There was ample evidence to support the finding that the joint through rates regarded as entireties were reasonable and justified. Prior existing rates, whether locals or such proportionate rates from a key point to points of destination as were made applicable to this particular class of traffic, or through rates upon other commodities moving from similar points of origin, are proper matters for consideration in establishing new through rates. To consider the weight of the evidence is beyond our province."

The Supreme Court, in speaking of the then nonexistent power of the Commission to fix minimum rates, in the case of Skinner & Eddy Corporation v. United States, 249 U. S. 557, 565, 39 S. Ct. 375, 378, 63 L. Ed. 772, said: "The commission's power over them [the carriers] in this respect extends no further than to discourage the making of unduly low rates by applying deterrents. One such deterrent is found in the fact that low rates, because voluntarily established by the carrier, may be accepted by the commission as evidence that other rates, actual or proposed, for comparable service are unreasonably high. Board of Trade of Carrollton, Ga., v. Central of Georgia, Ry. Co., 28 I. C. C. 154, 164; Sheridan Chamber of Commerce v. Chicago, Burlington & Quincy R. R. Co., 26 I. C. C. 638, 647. Compare Louisville & Nashville R. R. Co. v. United States, 238 U. S. 1, 11 et seq., 35 S. Ct. 696, 59 L. Ed. 1177."

Whether a rate is voluntarily established by a carrier or prescribed by the Commission, if in the judgment of the Commission it represents all that may reasonably be charged for the service performed, there would seem to be no logic in holding that it would not constitute some evidence of what might properly be charged for a similar service under similar conditions.

■■ An order of the Interstate Commerce Commission based upon an assumption of powers not possessed by it is void, and its enforcement will be restrained by the courts. Southern Pacific Co. v. Interstate Commerce Commission, 219 U. S. 433, 31 S. Ct. 288, 55 L. Ed. 283. It must, however, clearly appear that the Commission did exceed its powers in making an order, before the courts will interfere. In the case above referred to, the Supreme Court had before it the record, and, in determining that the Commission assumed powers not possessed, it had recourse to the record.

In the case of St. Louis & O'Fallon Ry. Co. v. United States, 279 U. S. 461, 485, 49 S. Ct. 384, 388, 73 L. Ed. 798, the court determined from the report itself that the Commission had exceeded its powers. It said: "The report of the Commission is long and argumentative. Much of it is devoted to general observations relative to the method and purpose of making valuations; many objections are urged to doctrine approved by us; and the superiority of another view is stoutly asserted. It carefully refrains from stating that any consideration whatever was given to present or reproduction costs in estimating the value of the carrier's property. Four dissenting Commissioners declare that reproduction costs were not considered; and the report itself confirms their view. Two of the majority avow a like understanding of the course pursued."

While it may be true here that the Commission overlooked the question as to whether the rates prescribed by it were intrinsically unreasonable, we do not think that that sufficiently appears from the face of the report, and the Commission denies that it failed to consider that factor.

■ We think that the refusal of the Commission to combine with the proceeding challenging the reasonableness of the rates in North Dakota and Northwestern Minnesota other proceedings relating to similar rates to other points in western trunk line territory was not so unreasonable as to justify the setting aside of the order complained of,

and was within the discretion of the Commission. The hearing with respect to the rates assailed might have shown that they were, in comparison with other rates, too high, or that the other rates were too low. If the Commission reached the conclusion that the rates assailed were not too high, that would have ended the controversy. If it found them out of line with other rates which it considered reasonable, it could reduce them without disturbing the other rates. It had before it the complaints of certain shippers as to certain rates in a certain territory, and the carriers, we think, had no absolute right to require that other controversies affecting other shippers and other territories be injected. The denials by the Commission of the petitions for consolidation were, we think, within its discretion.

The serious question in this case is whether the petitioners, in view of the rule announced by the Supreme Court in A., T. & S. F. Ry. Co. v. United States, 284 U. S. 248, 52 S. Ct. 146, 76 L. Ed. 273, were entitled to a rehearing because of changed economic conditions, and whether a denial of their application, therefore, was the equivalent of a denial of a fair hearing. In the case referred to, upon which the petitioners rely, the Commission had, of its own motion, investigated rate structures in the Western District with particular reference to grain rates. The record was closed in September, 1928. An order was entered fixing maximum rates on grain and its products, the effective date of which order was from time to time postponed. In February, 1931, before the order became effective, the carriers petitioned for a reopening of the case, setting up in detail and offering to prove that, since the closing of the record in 1928, economic changes had impaired their earnings and their credit, and that the order would reduce their revenues greatly; that, regardless of the question of its validity and propriety when made, it would no longer be valid and proper under existing circumstances. The Supreme Court held that the petition was not an ordinary petition for a rehearing, but was in the nature of a supplemental bill presenting a new and radically different situation, which had supervened since the record before the Commission had been closed, that the court would take judicial notice of the economic depression amounting to a changed economic level, which came after the close of the record in 1928 and which still existed in 1931, when the petition to reopen was filed, and that denial of the petition exceeded the permitted range of the Commission's discretion,

since a fair hearing is a fundamental requirement.

■ The record here was closed on January 15, 1930, although the matter was not argued before the Commission until October, 1930. The petition for rehearing was made before the effective date of the order of December 1, 1931, and shortly after the decision in A., T. & S. F. Ry. Co. v. United States, supra. The facts in this case and in that case are different. The proceeding here in question was not initiated by the Commission itself. The number of carriers involved in this case is not nearly so great; the territory affected is not nearly so large; the amount of carrier revenue affected by the reduced rates in this proceeding is comparatively small. The defendants and interveners feel that these things distinguish that case from this one. They believe that the Supreme Court was dealing with a specific case, and that the rule laid down by it cannot be said to be properly applicable to a situation where the questions involved are not so important and the consequences so grave. It is logically impossible to see why the number of carriers, the extent of territory, the amount of carrier revenue affected, can furnish the solution to the question as to whether a hearing by the Commission upon which an order reducing rates was based is fair or unfair, or whether its action in denying the petition for a rehearing was arbitrary or otherwise. A single carrier with a few miles of road, operating in a limited territory, is as much entitled to a fair hearing and fair treatment at the hands of the Commission as a large group of carriers operating in any vast territory, and the law will certainly afford it the same protection. It has the same rights as the powerful group, and may be very much more in need of them.

■■ Apparently, what the Supreme Court held was that before a reduced rate, which was based upon a record made prior to the economic change in values and business which commenced in the fall of 1929 and has grown more pronounced ever since, might become effective, it was incumbent upon the Commission, upon a suitable application of the carriers affected by such rate, setting up the changed conditions and facts which indicated that the rate fixed was no longer justified, to grant a rehearing so as to permit the carrier to produce evidence showing that the changed conditions justified a changed order. In other words, a rate which is prescribed upon a record not representative of present conditions, but of past conditions which were radically different, is not a rate prescribed after a fair hearing if the Commission has refused to accord to the carriers a hearing as to changed economic conditions called to its attention by a supplemental petition prior to the effective date of the rate order. The language of the Supreme Court is (A., T. & S. F. Ry. Co. v. U. S., supra, page 262 of 284 U. S., 52 S. Ct. 146, 150) : "In the instant proceeding, the hearing accorded related to conditions which had been radically changed, and a hearing, suitably requested, which would have permitted the presentation of evidence relating to existing conditions, was denied. We think that this action was not within the permitted range of the Commission's discretion, but was a denial of right."

A record closed January 15, 1930, was not representative of conditions existing in March, 1932. The most that can be said is that it was more representative of them than a record closed in 1928. It can be claimed that on December 1, 1931, the Commission knew of the change in economic conditions and the serious effects that it was having on the revenue of the carriers, and that the Commission must be assumed to have been of the opinion that the order which it then entered was a fair and proper order, taking these conditions into consideration. But this opinion on the part of the Commission was not the equivalent of a hearing, because it gave no opportunity to the carriers to present evidence or arguments. It may be true, as the defendants claim, that the petitioners should, during 1931, have made their application for a rehearing, based upon changed conditions, and should not have waited until after the decision in the A., T. & S. F. R. Co. Case before presenting it. It is probably true that that decision induced them to file their application for a rehearing. However, an order which has the effect of reducing the revenues of the petitioners substantially does not affect them alone, but is a matter of public interest; and, if the order reducing the rate is wrong, or if it was made upon a record which does not now justify its existence, or if the carriers were denied a fair hearing, it should be set aside, not only in the interest of the carriers, but in the public interest as well. There would seem to be no impropriety in the petitioners' taking advantage of the rule of law announced by the Supreme Court, if they properly can bring themselves within the rule, even if, in the absence of such a decision, they would have taken no such action.

It seems to us that, in view of A., T. & S. F. Ry. Co. v. United States, supra, the Commission could not, in view of the application of the carriers, make the order of December 1, 1931, reducing rates, effective without according them opportunity for a hearing as to the effect of changed economic conditions upon the question of the proposed reduction of rates, and that what the Commission may have had in mind or what it may have said or done in other proceedings is of no consequence. The facts remain that the revenues of these carriers were being substantially reduced by the order of December 1, 1931; that the record upon which the order was based was not representative of existing conditions; and that a proper petition for a rehearing, in the nature of a supplemental bill, had been filed before the rate order became effective, and that such petition was filed with reference to these particular rates and to this particular proceeding, and did not refer to rates generally nor to other proceedings.

Because of the Commission's denial of the petition to reopen on the ground of changed conditions, we reach the conclusion that the order of December 1, 1931, cannot be sustained, and should be enjoined.

The petitioners may present findings and a decree upon reasonable notice to the defendants and the interveners.