RAILWAY EXPRESS AGENCY, Inc., et al. v. UNITED STATES (INTERSTATE COMMERCE COMMISSION et al., Interveners).

District Court, S. D. New York.
March 7, 1934.

250

Henry Thurtell, of Washington, D. C., George R. Allen, of Philadelphia, Pa., and Albert M. Hartung, of New York City (Albert M. Hartung, of New York City, of counsel), for Railway Express Agency, Inc.

Henry J. Balzer, of Washington, D. C. (Henry Vollmer, Jr., of Brooklyn, N. Y., of counsel), for intervening defendants Wishnatzki & Nathel and others.

C. R. Marshall, of Washington, D. C., for intervening defendants R. W. Burch, Inc., and R. J. Head.

Theo. T. Turnbull, of Tallahassee, Fla., for intervener Railroad Commission of the State of Florida.

Charles H. O'Connor, of New York City, for intervening defendant Atlantic Commission Co.

Elmer E. Collins, Asst. Atty. Gen., for the United States.

Nelson Thomas and H. L. Underwood, both of Washington, D. C. (Daniel W. Knowlton and Nelson Thomas, both of Washington, D. C., of counsel), for Interstate Commerce Commission.

Heard, pursuant to title 28, United States Code, §§ 45 and 380 (45 USCA §§ 45, 380), by a three-judge court consisting of SWAN, Circuit Judge, and WOOLSEY and COXE, District Judges.

WOOLSEY, District Judge.

The judgment of the court herein is that the bill of complaint must be dismissed with costs, and a decree so providing may be entered.

I. The bill of complaint sets out that upon complaint of R. W. Burch, Inc., and others, proceedings were had before the Interstate Commerce Commission which resulted in the order of November 7, 1933, requiring reduction in express rates, express refrigeration charges, and freight charges of the plaintiffs in respect of transportation of fresh strawberries from points in Florida to destinations in Southern, Southwestern, Central, and Western trunk line territories and destinations in New England and in trunk line territory including the Buffalo-Pittsburg district.

The bill charges as its gravamen: (1) That the rates prescribed are confiscatory; (2) that the Commission has made strawberries shipped in refrigerated carload lots from Florida a favored class, and applied standards of reasonableness contrary to those provided by the Interstate Commerce Act (49 USCA § 1 et seq.); and (3) that the commission acted arbitrarily and contrary to the evidence and without evidence to support its order.

The prayer is for an injunction against the said order pendente lite and that on final hearing the United States and its officers and agents be permanently enjoined from enforcing the said order.

The United States filed an answer admitting that proceedings were had before the Commission and asserting that the resultant order of November 7, 1933, was in every respect lawful.

The Interstate Commerce Commission and numerous other parties who had appeared in the proceedings before the Commission intervened, pursuant to title 28, United States Code, § 45a (28 USCA § 45a), to support the order. Some of the interveners have filed answers and motions similar to the answer of the United States.

The cause came on for argument upon the plaintiffs' motion for a preliminary injunction.

Thereupon the plaintiffs filed a copy of the record of the proceedings before the Commission, and all parties asked that the case be dealt with and decided as upon a final hearing.

Originally, the order of November 7, 1933, was to go into effect on December 28, 1933. Subsequently, the time was extended by the Commission to February 5, 1934, and thereafter, by a further order, until ten days after the decision of this court herein.

There is no occasion, therefore, to grant a preliminary injunction. We shall, consequently, consider the case as on final hearing.

II. The proceeding before the Commission was heard twice on the same record.

The first hearing was before three Commissioners—Commissioners Lewis, Farrell, and Tate—sitting as Division 5, and resulted

in the unanimous report and order of December 30, 1932, which provided that future express rates on strawberries from Florida points of origin should not exceed 120 per cent. of the present first class freight rates, but left the refrigeration charges and freight rates then obtaining unchanged.

The rates prescribed by Division 5, as we understand it, are acceptable to the plaintiffs.

On the second hearing before the whole Commission these rates were reduced, and by the report and order then made—November 7, 1933—it was provided that for the future (1) express rates shall not exceed 105 per cent. of present first class rates; (2) express refrigeration charges shall not exceed 85 per cent. of present charges; and (3) freight rates shall not exceed 65 per cent. of present first class freight rates.

In the report after the reargument before the whole Commission, Commissioner Lee did not take part, and, of the nine Commissioners who heard the reargument, six, including Commissioners Lewis and Tate, who sat in Division 5, voted for the reductions of which complaint is here made. Commissioner Farrell, who also sat in Division 5, however, did not change his vote, and Commissioner Miller and Commissioner Mahaffie dissented from the vote of the majority of the full Commission.

III.  In order to be able to appreciate the rationale of the proceedings before the Interstate Commerce Commission by R. W. Burch, Inc., No. 23972, Wishnatzki & Nathel et al., No. 24145, Caruso, etc., Inc., No. 24671, and R. W. Burch, Inc., v. Atlantic Coast Line Railroad, No. 24612, and others, it should be observed that all these complainants were involved in one way or another in the strawberry trade between Florida and Northern points, and that the gravamen of their complaint to the Commission was that the rates for the transportation of strawberries under refrigeration both by express and by freight were much lower for strawberries originating in Alabama, in Texas and the Mississippi Valley States of Louisiana, Mississippi, Arkansas, and Missouri to the same destination territories in the North than for strawberries originating in Florida.

Particular emphasis was placed on the fact that the existing freight rates unduly preferred competitors of the complainants, especially those whose strawberries originated in Louisiana.

The Interstate Commerce Commission, as it points out in its report, had prescribed and approved the rates on strawberries from all the Southwestern producing points and from some of the Southern and Southeastern producing points. Consolidated Southwestern Cases, 123 I. C. C. 203; Arkansas R. R. Commission v. Ann Arbor R. Co., 153 I. C. C. 371; Coulbourn Fruit Co. v. Baltimore & Ohio R. R. Co., 104 I. C. C. 734; Lewis v. L. & N. R. R. Co., 112 I. C. C. 213; Lewis Co. v. Cincinnati, N. O. & T. P. Ry. Co., 128 I. C. C. 3.

The competition between Louisiana and Florida strawberries is shown by what the Commission states regarding the season for and marketing of strawberries.

It finds that the Florida season for strawberries begins in December and ends about the middle of May, and the peak of production is in February and March. The Louisiana and Texas seasons open in March, reaching a peak of production in April. In Alabama and Mississippi the peak is also in April, which is the opening month of their season. That there is direct competition between Florida strawberries and Louisiana strawberries is indicated in the list given in the Commission's report of cars arriving during the strawberry season of 1930 at Philadelphia as a typical destination point.

It is, of course, only during the months of March, April, and May, when their seasons overlap, that the competition between the Florida strawberries and Louisiana strawberries comes poignantly to be felt. But it finally becomes so acute that the Florida berry is forced off the Northern markets, with the result that every year a large portion of the late Florida crop cannot be marketed and has to be destroyed in the fields.

The Commission finds that the high transportation charge from Florida is the reason why the Florida strawberry is unable to compete with the Louisiana strawberry during the latter part of the season.

There is not any difference in the actual service given by the railways from the Florida shipping points and from the shipping points in Louisiana and other Mississippi Valley territory. In this the situation differs from the shipments from the Delmarva Peninsula, commonly called the Eastern Shore, which was cited by the plaintiff as an example of higher rates than the Commission has found in its ultimate decision on the proceedings involved herein. There, however, the equivalent of passenger train service is given to strawberry shippers, and somewhat higher rates are necessarily allowed. The reason for this special service, apparently, is that the berries from

the Eastern Shore, as well as from North Carolina, for some reason do not stand transportation as well as do the Florida berries, and so need to have faster deliveries. The North Carolina and Eastern Shore service rendered to strawberry shippers, therefore, being a more expensive service than that rendered to the Florida shippers, is not a norm by which to measure rates from Florida, where the strawberry service is just the same as that accorded to any other perishable freight. Cf. Peninsula Produce Exchange v. Penn. R. R. Co., 160 I. C. C. 711.

IV. Before December 1, 1929, carload movements originating in Florida were wholly in freight service under refrigeration. The express refrigerated service thence was inaugurated December 1, 1929, after investigation proceedings initiated by the Commission on its own motion had satisfied it that the existing freight service was inadequate to the increase that had occurred in the Florida strawberry acreage, and that a service involving greater speed was advisable. Transportation of Strawberries by Express, 151 I. C. C. 553; Id., 156 I. C. C. 4.

The carriers were required to arrange for the establishment of an express refrigerated carload service. This service is furnished by the plaintiff in this case, Railway Express Agency, Incorporated, under a special agreement with the rail carriers. The Commission has never fixed rates for this express service or for refrigerated freight service from Florida.

V. The Commission was therefore faced, in the proceedings which eventuated in this cause, with a situation in which it found that it had prescribed a basis of 65 per cent. of normal first class freight rates subject to a minimum carload of 17,000 pounds in refrigerated carload lots, for about 50 per cent. of all the commercial strawberries produced in the United States, and at the same time the carriers had established a much higher carrier-fixed rate structure in Florida for the same kind of service.

The Commission summarizes very well the situation that had existed as to the rate structure for other commodities which it had prescribed in Florida and the South and Southwest. It says:

"Complainants cite numerous other cases in which we prescribed for commodities from and to the south including the Florida Peninsula the same percentage of first class as we had previously prescribed for application on the same commodities between southwestern points. Review of these and similar cases bearing upon this question discloses that heretofore we have generally accepted the class rate structure which we prescribed in Florida, the south and the southwest, as fairly representing the differences in transportation conditions in the three territories; that in the prescription of rates on like commodities in the three territories we have, as a rule, used the same percentages of first class; and that we have departed from this rule only in cases where there was a definite showing of some peculiar condition which would have rendered the application of like percentage relationships in the three territories unfair or otherwise inappropriate.

"The Florida defendants render services substantially similar to those performed by the carriers serving the southwest and most of the south. When we prescribed the 65-percent basis from southwestern points the traffic moved under refrigeration in expedited service and that character of service is still being performed by the southwestern carriers. Strawberries from Florida and other southern producing sections likewise move under refrigeration in expedited service. The expedited service performed by the Florida defendants is good but it is not superior to that rendered by the carriers serving other producing sections in the south and southwest."

█ It was quite proper for, if, indeed, it was not the duty of, the Commission as an administrative body with quasi legislative powers on rates to give consideration to the difference in rates on a commodity prescribed by it in one territory of origin and the rates fixed by carriers in another territory of origin for identic service under substantially similar conditions, to give to such comparison such value as it sees fit, and to use it as one of the reasons for its ultimate findings.

The Supreme Court says in Louisville & Nashville Railroad Co. v. United States, 238 U. S. 1, at page 15, 35 S. Ct. 696, 700, 59 L. Ed. 1177, in dealing with the question of a coal rate on the Louisville & Nashville Railroad to Nashville: "Giving the widest possible effect to the fact that mere comparison between rates does not necessarily tend to establish the reasonableness of either, it is still true that, when one of many rates is found to be higher than all others, there may arise a presumption that the single rate is high. And when to that is added the fact that some of the comparative and lower rates had been prescribed by the Commission, there was at least a prima facie standard, which, after allowing for dissimilarity in conditions, might be used

along with all the other evidence in order to test the reasonableness of the Nashville rate."

Later in the opinion there is a quotation from the court's earlier opinion in Interstate Commerce Commission v. Louisville & Nashville Railroad, 227 U. S. 88, at page 98, 33 S. Ct. 185, 57 L. Ed. 431, as follows: "The pleadings charged that the new rates were unjust in themselves and by comparison with others. This was denied by the carrier. The Commission considered evidence and made findings relating to rates which the carrier insists had been compelled by competition, and were not a proper standard by which to measure those here involved. The value of such evidence necessarily varies according to circumstances, but the weight to be given it is peculiarly for the body experienced in such matters and familiar with the complexities, intricacies, and history of rate-making in each section of the country."

To the same effect are Western Chemical Co. v. United States, 271 U. S. 268, 271, 46 S. Ct. 500, 70 L. Ed. 941; Northern Pacific Railway Co. v. United States (D. C.) 60 F. (2d) 302, 308, reversed on other grounds 288 U. S. 490, 53 S. Ct. 406, 77 L. Ed. 914; Interstate Commerce Commission v. Louisville & Nashville Railroad, 227 U. S. 88, 98, 33 S. Ct. 185, 57 L. Ed. 431.

█ VI. The contention that the prescribed rates are so low as to amount to confiscation rests wholly upon certain cost studies introduced as schedules by plaintiffs.

The plaintiffs insist that the evidence which they presented was undisputed, despite the fact that the Commission pointed out that there were many uncertain factors in the studies, and that in a number of material elements they were untrustworthy.

It was entirely within the competence of the Commission to reject this evidence as it has done. Whether a fact-finding body believes a witness or not is its own concern.

Indeed, it seems to us that the Commission's challenge of these costs is entirely supportable, for it would be almost impossible accurately to show by such cost schedules what the actual cost of carrying a particular commodity was when that commodity was but one of thousands of different kinds of commodities carried by the railroads. Consequently it would be almost, if not quite, impossible to establish that a rate on any individual commodity was confiscatory.

To attempt to show that the rate prescribed for the carriage of a single one of many thousand commodities is confiscatory or indeed unreasonable is inherently very much more difficult than to make such showing in respect of the rate prescribed for a homogeneous service, such as that furnished by a city traction line or by an electric public utility.

The difficulty facing such proof has been often recognized by the Supreme Court; e. g., Louisville & Nashville Railroad Co. v. Garrett, 231 U. S. 298, 314, 315, 34 S. Ct. 48, 58 L. Ed. 229; Northern Pacific R. Co. v. State of North Dakota, 216 U. S. 579–581, 30 S. Ct. 423, 54 L. Ed. 624; Interstate Commerce Commission v. Union Pacific Railroad Co., 222 U. S. 541, 549, 32 S. Ct. 108, 56 L. Ed. 308; Atlantic Coast Line R. Co. v. State of Florida, 203 U. S. 256, 260, 27 S. Ct. 108, 51 L. Ed. 174.

In the light of what was said of such proof of the decisions just cited, it seems to us that it certainly does not lie within our province to find fault with the criticism which the Commission made of the cost study schedules which were the principal basis of the complainants' case, or to challenge the Commission's refusal to accept them at their face value.

█ The decision of the Commission cannot be set aside by a court because on like testimony the court might not have made a similar ruling. The weight of the evidence or the wisdom of the conclusions is beyond the province of the courts. Northern Pacific Railroad Co. v. State of North Dakota, 216 U. S. 579, 30 S. Ct. 423, 54 L. Ed. 624; Illinois Cent. R. Co. v. Interstate Commerce Commission, 206 U. S. 441, 27 S. Ct. 700, 51 L. Ed. 1128.

Quite apart from the detailed criticism made by the Commission, it may be observed that, although the carriers would have been satisfied with the rates prescribed by Division 5, still the cost studies which they have introduced prove, if true, that these rates also were below the cost of service. This clearly proves too much, and in the present case inferentially puts the cost estimates at once under a cloud.

█ We think the affidavits of Lamb and Gross filed herein, whereby they seek to meet the Commission's criticism on their cost evidence and schedules, really involve argument which should have been addressed to the Commission at the time of the rehearing, rather than to the court in the present cause, for courts must necessarily remain outside of the zone of such disputed questions of fact as may be involved in proceedings before the

commission. These affidavits, therefore, are not relevant in this cause.

■ VII. The contention that the order is not supported by evidence is also not well founded.

As above indicated, the Commission considered evidence relating to rates from other points in similarly situated territory, a comparison which has been held proper as above noted in a number of decisions. See Louisville & Nashville Railroad Co. v. United States, 238 U. S. 1, 15, 16, 35 S. Ct. 696, 59 L. Ed. 1177; Skinner & Eddy Corp. v. United States, 249 U. S. 557, 565, 39 S. Ct. 375, 63 L. Ed. 772; Virginian Railway v. United States, 272 U. S. 658, 665, 666, 47 S. Ct. 222, 71 L. Ed. 463.

The carriers urge, however, that this evidence was not a proper basis for the orders because the conditions of transportation and of competition were not the same. The Commission, after giving consideration to this contention, specifically found that these rates were a reasonable means of chancering the proper rates in the present case. This finding is a determination of fact, and a court has not any concern with the correctness of the Commission's reasoning or the soundness of its conclusion. Virginian Railway v. United States, 272 U. S. 658, 665, 666, 47 S. Ct. 222, 71 L. Ed. 463; Illinois Central Railroad Co. v. Interstate Commerce Commission, 206 U. S. 441, 454, 27 S. Ct. 700, 51 L. Ed. 1128. In Interstate Commerce Commission v. Louisville & Nashville Railroad Co., 227 U. S. 88, 98, 33 S. Ct. 185, 189, 57 L. Ed. 431, the court said: "The value of such evidence necessarily varies according to circumstances, but the weight to be given it is peculiarly for the body experienced in such matters and familiar with the complexities, intricacies, and history of rate making in each section of the country."

■ The plaintiffs also argue that in some instances these comparative rates were from territories where strawberries were rated third class, while in Florida strawberries are rated first class. However, it is hardly possible to contend seriously that the classification of commodities can operate to control the fixing of freight rates or to prohibit the Commission from  preventing unjust discrimination against particular localities.

■ VIII. In addition, the plaintiffs argue that in fixing the express rates the Commission took as its guide the rates established in Express Rates, 1922, 83 I. C. C. 606, Id., 89 I. C. C. 297, and that these rates were established in depressed times without giving consideration to what was the proper basis for computing the express charges. It is true that there are certain expressions of opinion by members of the Commission in those cases to this effect, but the majority did not feel that the record was inadequate to show what was the cost of transportation. Nor will this court set aside a finding of reasonableness on the ground of alleged inconsistencies with findings made in other proceedings of the Commission. Virginian Railway Co. v. United States, 272 U. S. 658, 47 S. Ct. 222, 71 L. Ed. 463.

■ Furthermore, it is not to be assumed that, if these rates were as unremunerative as plaintiffs contend, the carriers would have continued them for so long a period of time without complaint that their expenses in respect of such transportation were greater than their revenue. Cf. Interstate Commerce Commission v. Union Pacific R. R., 222 U. S. 541, 543, 32 S. Ct. 108, 56 L. Ed. 308; Louisville & Nashville Railroad Co. v. Garrett, 231 U. S. 298, 314, 34 S. Ct. 48, 58 L. Ed. 229.

■ IX. It is also argued that the Commission acted arbitrarily.

The principal reliance for this argument is placed upon the Commission's alleged inconsistency in sustaining as reasonable Division 5's rates for the period prior to March 3, 1933, and holding them unreasonably high for the future. It is true that there is nothing to show any change in conditions after March 3, 1933, for all the evidence was closed in October, 1932. However, there is nothing inconsistent in this action. It was merely a recognition by the Commission that it may not reject with retroactive effect a rate which it itself has declared to be reasonable and lawful and to which the carrier has conformed. By declaring its own finding improper, the Commission would oblige a carrier which had acted on its previous order to make reparations on the basis of the new rates. Such an order would be improper.

We think that this method of dealing with findings Nos. 1 and 2 of the report of the full Commission of November 7, 1933, is charted for us clearly by the decision of the Supreme Court in Arizona Grocery Co. v. Atchison, T. & S. F. Ry. Co., 284 U. S. 370, 52 S. Ct. 183, 76 L. Ed. 348, which was in the Supreme Court on certiorari from a decision of the Circuit Court of Appeals for the Ninth Circuit [49 F.(2d) 563] in an action at law involving a reparation order.

At page 388 of 284 U. S., 52 S. Ct. 183, 186, Mr. Justice Roberts says:

"As has been pointed out, the system now administered by the Commission is dual in nature. As respects a rate made by the carrier, its adjudication finds the facts, and may involve a liability to pay reparation. The Commission may, and often does, in the same proceeding, and in a single report and order, exercise its additional authority by fixing rates or rate limits for the future. But the fact that this function is combined with that of passing upon the rates theretofore and then in effect does not alter the character of the action. (Citing in footnote the following cases: Interstate Commerce Commission Co. v. Cincinnati, N. O. & T. P. Ry. Co., 167 U. S. 479, 499, 17 S. Ct. 896, 42 L. Ed. 243; Baer Bros. Co. v. Denver & R. G. R. Co., 233 U. S. 479, 34 S. Ct. 641, 58 L. Ed. 1055.)

"As respects its future conduct, the carrier is entitled to rely upon the declaration as to what will be a lawful, that is, a reasonable, rate; and, if the order merely sets limits, it is entitled to protection if it fixes a rate which falls within them. Where, as in this case, the Commission has made an order having a dual aspect, it may not in a subsequent proceeding, acting in its quasi judicial capacity, ignore its own pronouncement promulgated in its quasi legislative capacity and retroactively repeal its own enactment as to the reasonableness of the rate it has prescribed."

And continuing on page 389 of 284 U. S., 52 S. Ct. 183, 186, Mr. Justice Roberts says that the Commission "was bound to recognize the validity of * * * its own enactment with retroactive effect. It could repeal the order as it affected future action, and substitute a new rule of conduct as often as occasion might require, but this was obviously the limit of its power, as of that of the Legislature itself."

It seems to us necessarily to follow that, whilst we are not concerned here directly with the findings of the Commission in regard to reparation, in so far as those findings might be cited as showing arbitrary or ill-advised action by the Commission, such an argument cannot prevail, because, after Division 5 of the Commission had fixed rates by its order of December, 1932, to become effectual in March, 1933, carriers complying therewith could not properly be mulcted in damages for so doing.

With regard to the argument as to the Commission having acted arbitrarily, it seems to us that the conclusive answer is shown in the fact that, after the decision by Division 5 of the Commission, consisting of three Commissioners, there was a full reargument before the whole Commission, and two of the Commissioners who sat in Division 5 changed their minds. Surely such considered attention to a situation as is shown by that circumstance in the history of this case cannot be a proper basis for a contention that there was any arbitrary action by the Commission.

X. The defendants may submit for signature findings of fact and conclusions of law consistent with the foregoing opinion, and, after those are signed, a final decree may be noticed dismissing the complaint, with costs.